858 F.2d 210
 M.A. A26851062, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent,
Central American Refugee Center; Lawyers Committee for
Human Rights and Americas Watch, Amici Curiae.
 No. 88-3004.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 5, 1988.
Decided Sept. 29, 1988.
 
 William Peter Van Wyke, Washington, D.C., for petitioner.
 Parker Singh, Jr., Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice (John R. Bolton, Asst. Atty. Gen., Civil Div., Joan E. Smiley, Asst. Director, Washington, D.C., on brief), for respondent.
 (Arthur C. Helton, Laura B. Sherman, New York City, on brief) for amicus curiae Lawyers Committee for Human Rights Americas Watch.
 (Steven G. Reade, Hadrian R. Katz, Andrew W. Shoyer, Darina C. McKelvie, Gwyn Firth Murray, Arnold & Porter; Monica C. Yriart, Washington, D.C., on brief), for amicus curiae Cent. American Refugee Center.
 Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 This is a petition for review of a final order of deportation issued by the Board of Immigration Appeals on December 28, 1987, denying the petitioner's motion to reopen deportation proceedings to allow a hearing on his request for political asylum in the United States. We reverse the order denying reopening, and we remand the case for a determination on the merits of whether petitioner should be eligible to be granted political asylum.
 
 I.
 
 2
 Petitioner, M.A., is a native and citizen of El Salvador. He entered the United States in February, 1982 at or near Brownsville, Texas, without inspection. The Immigration and Naturalization Service (INS) initiated deportation proceedings against him on February 22, 1984. At a hearing July 16, 1984, M.A., on the advice of his former counsel, declined to request political asylum in the United States. However, he requested and was granted voluntary departure until September 16, 1984 as his sole relief from deportation. He did not leave by that date, and the order ripened into an order of deportation. He was apprehended and detained by INS on January 15, 1985.
 
 
 3
 A motion to reopen his case was filed by new counsel on Monday, January 21, along with a request for political asylum drafted while M.A. was held by INS in the Baltimore City Jail. A motion for a stay of deportation was also filed, as deportation was scheduled for the following day. The motion to reopen claimed ineffective assistance of M.A.'s former counsel as the reasonable explanation required for not presenting the asylum application before the close of deportation proceedings. See 8 C.F.R. Sec. 208.11. M.A. requested 10 days to augment his asylum claim, but the Immigration Judge denied the motion to reopen the following day, and the Board affirmed.
 
 
 4
 M.A. appealed to us and we reversed and remanded, holding that (1) a reasonable explanation had been shown for not requesting asylum before the close of the deportation hearing, and (2) the Immigration Judge had abused his discretion in not granting the 10-day continuance under the circumstances in order to allow M.A. and his counsel an adequate opportunity to present a prima facie asylum claim prior to his deportation. See Alvarez v. INS, No. 85-1221 (4 Cir. January 24, 1986) (unpublished).
 
 
 5
 On remand, M.A. presented a renewed application for political asylum and supporting evidence. The only issue before the immigration judge was whether M.A. had presented a prima facie case for political asylum so as to warrant reopening his deportation proceedings to prove his eligibility therefor. The Immigration Judge found that he had not. M.A. appealed, and the Board affirmed. The Board also denied M.A.'s claim of a right under the Geneva Conventions not to be deported to a country at war. This petition for review contests the correctness of both of these rulings.
 
 II.
 
 6
 In order to appraise properly the legal sufficiency of M.A.'s allegations and proffered proofs to justify reopening the deportation proceedings to permit him to request political asylum, we consider first the law applicable to such a request.
 
 
 7
 Eligibility for political asylum is governed by the Refugee Act of 1980, Pub.L. 96-212, 94 Stat. 102 (1980), which amended Section 208(a) of the Immigration and Nationality Act of 1952 to read as follows:
 
 
 8
 The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.
 
 
 9
 Codified at 8 U.S.C. Sec. 1158(a).
 
 
 10
 Eligibility under Sec. 208 therefore depends upon whether the alien is a "refugee", as defined in 8 U.S.C. Sec. 1101(a)(42)(A). So far as is pertinent here, that definition is:
 
 
 11
 The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 12
 Thus, an alien who is able to establish that he suffers "persecution or a well-founded fear of persecution" is considered a refugee, and may, at the discretion of the Attorney General, be granted asylum in the United States. Sec. 208(a).
 
 III.
 
 13
 In developing a definition of "a well-founded fear" we look both to the precedents of other circuits, although scarce, and to the United Nations protocol on refugees. See INS v. Cardoza-Fonseca, 480 U.S. 421, 450-52, 107 S.Ct. 1207, 1222-23, 94 L.Ed.2d 434, 459-60 (Blackmun, J. concurring). In Cardoza-Fonseca, although the majority of the Supreme Court declined to establish a precise definition of "well-founded fear", it held that proof of a well-founded fear of persecution does not require the asylum-seeker to show "by objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation," the standard which an alien must meet in order to receive withholding of deportation under Sec. 243(h) (8 U.S.C. Sec. 1253(h)). Id. at 429, 107 S.Ct. at 1212, 94 L.Ed.2d 447 (footnote omitted). In INS v. Stevic, 467 U.S. 407, 424-25, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984), the Court offered the following formulation as guidance in defining a well-founded fear: "So long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility." The question thus unanswered by Cardoza-Fonseca is what proportion of objective and subjective evidence is necessary to support a well-founded fear, and specifically how much objective evidence must be adduced to render the subjective fear "well-founded."
 
 
 14
 The Fifth Circuit has held that "[a]n alien possesses a well-founded fear of persecution if a reasonable person in her circumstances would fear persecution if she were to be returned to her native country." Guevara Flores v. INS, 786 F.2d 1242, 1249 (5 Cir.1986). The Seventh Circuit has also articulated a standard applicable to requests for asylum, and requires that the petitioner presentspecific facts establishing that he or she has actually been the victim of persecution or has some other good reason to fear that he or she will be singled out for persecution....
 
 
 15
 Carvajal-Munoz v. INS, 743 F.2d 562, 574 (7 Cir.1984) (emphasis in original), relied on by Guevara Flores, 786 F.2d at 1249; Cardoza-Fonseca v. INS, 767 F.2d 1448, 1453 (9 Cir.1985), aff'd 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Frequently however, corroborative (or "objective") evidence of specific facts that an individual seeking political asylum will be singled out for persecution is unavailable, and, we think, unnecessary.[1] Although there may be instances in which an individual's political or other activity protected under the Refugee Act forms the basis of a well-founded fear of persecution, the language of the statute clearly envisions that a well-founded fear "may be based upon group characteristics such as the petitioner's religion." Dolores v. INS, 772 F.2d 223, 226 (6 Cir.1985).
 
 
 16
 We interpret the petitioner's burden to produce specific, objective evidence of a "good reason" to fear persecution, not to require evidence that demonstrates that the petitioner has individually been threatened by the authorities. Rather, the petitioner ought to be able to adduce objective evidence that members of his group, which includes those with the same political beliefs of the petitioner, are routinely subject to persecution.[2] See Cardoza-Fonseca, 480 U.S. at 429, 107 S.Ct. at 1212, 94 L.Ed.2d at 447 (one in 10 certainty of a member of one's group being persecuted provides basis for a well-founded fear). Cf. Yousif v. INS, 794 F.2d 236, 242-43 (6 Cir.1986) (petitioner failed to support contention that Christians or Chaldeans as a group are being persecuted).
 
 
 17
 As will appear, M.A.'s petition presents a special problem because his claim of fear of persecution is based largely on his status as a draft evader. His petition thus raises the further question of when a nation's enforcement of its laws against evasion of military service is unjustified, and thus constitutes persecution, and when the draft evader may lawfully refuse to serve because the military commits acts condemned by the international community.
 
 
 18
 The United Nations High Commissioner for Refugees (UNHCR), Handbook on Procedures and Criteria for Determining Refugee Status paragraphs 170-71 (Geneva 1979) [hereinafter Handbook ] recognizes draft evaders as a distinct group for purposes of determining refugee status. Although the Handbook had not yet been published when Congress passed the Refugee Act of 1980, we follow the lead of other courts in recognizing that the Handbook provides significant guidance in interpreting the Refugee Act.[3] See CardozaFonseca, 480 U.S. at 429 n. 22, 107 S.Ct. at 1217 n. 22, 94 L.Ed.2d at 452 n. 22; Hernandez-Ortiz v. INS, 777 F.2d 509, 514 n. 3 (9 Cir.1985); Ananeh-Firempong v. INS, 766 F.2d 621 (1 Cir.1985); Stevic v. Sava, 678 F.2d 401 (2 Cir.1982), rev'd on other grounds, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). We note that the Board has also looked to the Handbook for guidance in interpreting the Protocol and the Refugee Act of 1980. See, e.g., In re Frentescu, 18 I & N Dec. 244, 246 (BIA 1982); Matter of Rodriguez-Palma, 17 I & N Dec. 465 (BIA 1980).
 
 
 19
 Normally, a sovereign nation enjoys the right to enforce its draft laws, and penalties for evasion are not considered persecution as defined by the UNHCR, as well as established INS precedent. See, e.g., Espinoza-Martinez v. INS, 754 F.2d 1536, 1540 (9 Cir.1985). One who shows only that he will be punished the same as any other draft evader or deserter in his country, does not state a valid claim of persecution. Where the draft evader shows, however, that he would "suffer disproportionately severe punishment for the military offence on account of his race, religion, nationality, membership of a particular social group or political opinion," he should be considered a refugee. Handbook p 169.
 
 
 20
 Failure to serve in the military may also be the expression of a political opinion, subjecting the evader to the same punishment as any other draft evader. When this occurs, the applicant should ordinarily be denied refugee status because the draft is generally recognized as lawful. There is, however, an exception to this general rule:
 
 
 21
 There are, however, also cases where the necessity to perform military service may be the sole ground for a claim to refugee status, i.e. when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.
 
 
 22
 Not every conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion. It is not enough for a person to be in disagreement with his government regarding the political justification for a particular military action. Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in the light of all other requirements of the definition, in itself be regarded as persecution.
 
 
 23
 Handbook paragraphs 170-71. It is the possibility that an unwilling conscriptee may be associated with the commission of atrocities which places him in a different predicament from that of a conscriptee who merely disagrees with the political justification of a conflict.[4] See, e.g., Kaveh-Haghigy v. INS, 783 F.2d 1321, 1323 (9 Cir.1986) (allegedly "illegal, revolutionary war" in Iran did not render all obligatory military service persecution).
 
 
 24
 The Board has also acknowledged that eligibility for asylum may be established on the grounds that the individual is averse to military service on account of political opposition. Matter of Salim, 18 I & N Dec. 311 (BIA 1982); see also Sarkis v. Sava, 599 F.Supp. 724 (E.D.N.Y.1984). In Salim, the Board found that the Soviet practice of "dragooning and forcibly impressing into its forces men and boys as replacements" for Afghan soldiers who refuse to fight under the Soviet command against their compatriots was clearly different "from persecution claims by aliens who merely seek to avoid military service in their country." 18 I & N Dec. at 313. Salim therefore considered both the refusal of the Afghan soldiers to commit violence against their fellow countrymen, as well as the type of punishment inflicted for the infraction of desertion, to be relevant factors in ascertaining whether the applicant suffered a well-founded fear of persecution.
 
 
 25
 Thus, where draft evasion is the expression of political opposition to the government, the Board must treat the applicant as it would any other applicant for political asylum, taking into account the genuineness of the alien's conviction, the type of treatment which the alien fears upon his return to his country, the reasons for such treatment, and the reasonableness of the fear. Where the military engages in internationally condemned acts of violence with which the asylum-seeker sincerely does not wish to be associated, in light of the UNHCR, the only relevant factor is the likelihood that the alien will be punished.
 
 IV.
 
 26
 In summary, therefore, M.A., in order to reopen his deportation hearing to include a request for political asylum, must present a prima facie case that he is eligible for the relief he seeks. "A prima facie case is established when an alien presents 'affidavits or other evidentiary material,' 8 C.F.R. Sec. 103.5, which, if true, would satisfy the requirements for substantive relief." Hernandez-Ortiz v. INS, 777 F.2d at 513. Moreover, in ruling on the denial of a motion to reopen a hearing of this nature, we must accept as true the facts stated in the alien's affidavit and supporting documents unless they are inherently unbelievable. Maroufi v. INS, 772 F.2d 597, 600 (9 Cir.1985).
 
 V.
 
 27
 We turn now to the facts of the case viewed in the light most favorable to M.A.
 
 
 28
 M.A. fled El Salvador in 1982 "to avoid serving in its violent military" and seeks asylum based on the atrocities committed by the army, and the consequences he might suffer for his failure to serve. He has presented three different types of evidence to support his petition for asylum. He has proffered his own testimony, the testimony of two Americans familiar with the social and political milieu of El Salvador, and finally, published reports of the abuses of human rights perpetrated by the military in El Salvador.
 
 
 29
 In his application for political asylum, M.A. stated that he feared returning to El Salvador. He thought it likely that he would be "rounded up and made to serve."[5] He stated that it was a common practice for the military to pick up "young people from buses, from the street, from wherever they can find them...."
 
 
 30
 At one time, M.A. was recruited by a friend to be a spy for the army and the government. He was encouraged to "denounce" others suspected of anti-government activity. His friend informed him that those who had been denounced would likely be tortured and killed. M.A. described having seen the victims of torture lying outside of the morgue, often decapitated, maimed or burned, and concluded that he could never support those who committed such atrocities.
 
 
 31
 M.A. has testified that he could not in good conscience serve in such a cruel and unjust army. However, he fears the consequences of not serving, and of being branded as a subversive. In his words, "subversives were summarily executed by the army or security forces, who then publicly deny their involvement and their responsibility." He is acquainted with people who have been killed by the military for expressing their political opposition to the government of El Salvador. His cousin was killed after participating in an anti-government demonstration, and his brother-in-law's brother was killed after having fed guerillas in his home which was located in an area controlled by the guerilla forces in El Salvador. Additionally, M.A. has been beaten twice by National Guardsmen at roadblocks, once for being suspected of covert political activity, and once for no apparent reason.
 
 
 32
 M.A.'s affidavit tends to show that political opponents of the government are treated brutally by the military when their opposition is either public, or made known to the military by informants. Of course M.A. has an obvious motive to make such self-serving statements in the context of an asylum hearing. Nevertheless, such statements should be accepted as true "where they establish factual circumstances with specificity, are not speculative, and do not conflict with petitioner's other evidence." Carvajal-Munoz, 743 F.2d at 577.
 
 
 33
 To support his statements about the role of the military in violating human rights in El Salvador, and the consequences of not having served, M.A. has presented affidavits from Dr. Charles Clements, who practiced medicine in El Salvador from March 1982 to February 1983, and William M. Leo Grande, director of Political Science at the School of Government and Public Administration at American University in Washington, D.C. Dr. Clements stated that he had conducted interviews of at least 60 government soldiers released after capture by the guerrillas:
 
 
 34
 As a result of such conversations/interviews, I had been informed of the following types of practices engaged in by government troops as a matter of course and a response to the commands from officers. I was told by prisoners that they are taught to kill women and children because women are potential factories for more guerrillas, and children are seeds of the guerrillas. I was told that it was common practice to torture known guerrillas and that it was not unusual that women who were considered sympathizers with guerrillas would be raped.
 
 
 35
 I have seen prisoners as young as 15 years old who were in the regular army. When asked why they participated in search and destroy operations in which many innocent civilians are killed, they explained that to show any sign of hesitation or reluctance is to invite personal danger from superiors. When asked why they do not desert, they repeatedly told me that they have seen pictures of deserters posted in their barracks along side pictures of their families bearing such inscriptions as "killed in the cross fire."
 
 
 36
 * * *
 
 
 37
 * * *
 
 
 38
 I have never met a prisoner of war who was not conscripted. Some of them were conscripted forcibly. Avoiding conscription notice means that your family is labeled subversive and invites danger to all of them.
 
 
 39
 Mr. Grande stated that "[t]o be a man of military age and not to have served in the Armed Forces, in addition to fled [sic] the country, is enough to create the suspicion that that individual is an opponent of the government. And to be suspected of being an opponent of the government in El Salvador, is to be in grave danger."
 
 
 40
 Finally, M.A. has included documentary evidence, prepared by Americas Watch and Amnesty International, of the dismal condition of human rights in El Salvador, and the role of the military in perpetrating many of the human rights abuses. He has also included numerous newspaper reports of the military's violent policies towards civilians. Such documentary evidence should not be used to undermine the significance of the specific threats to an individual's life or freedom, but instead "presents an 'additional reason to take the threat seriously.' " Hernandez-Ortiz v. INS, 777 F.2d at 515, quoting Bolanos-Hernandez v. INS, 767 F.2d 1277, 1285 (9 Cir.1984). Likewise, we see no reason to distinguish the authenticity of this type of evidence from any other evidence presented by the applicant for political asylum seeking a reopening of a hearing. Unless inherently incredible, it should be accepted as true.
 
 
 41
 The Board denied the petitioner's motion to reopen his hearing on two grounds. It found that M.A. had not presented evidence to show the likelihood of individual persecution based solely on his failure to serve in the military, or to show that "his predicament is appreciably different from the danger facing all the population." Matter of A.G., A-26851062 (BIA Dec. 28, 1987) (Interim Decision). The Board also rejected M.A.'s claim that he would be forced to associate with a military force that commits internationally condemned acts on the ground that M.A. had not shown (1) that he would be required to engage in inhuman conduct as a result of military service mandated by the government, and (2) that there existed no official condemnation of the policies of the Salvadoran military or government, "which would be necessary at a minimum for us to accept this argument." Id.
 
 
 42
 We think that the Board has made the petitioner's burden unduly harsh. An applicant for political asylum should not be required to prove that he would be compelled to commit atrocities. It is unlikely that such a standard could ever be met. Paragraph 171 of the Handbook focuses instead on the association with certain types of military action as the relevant inquiry. Whether an individual will be associated with condemned conduct will depend largely on how widespread it has become, and it follows that the likelihood that an individual would be forced to participate in atrocities increases as the atrocities become more widespread. We therefore think that the appropriate inquiry is to consider the pervasiveness of atrocities. We think also that petitioner has presented sufficient evidence from a wide variety of sources to show that atrocities committed against the civilian population by the military are frequent and widespread.
 
 
 43
 We also decline to adopt the Board's requirement that there be proof that the acts of atrocity with which M.A. does not want to be associated are the policies of the Salvadoran government. It is sufficient that M.A. show that the Salvadoran government is unwilling or unable to control the offending group, here, the armed forces. See Lazo-Majano v. INS, 813 F.2d 1432, 1434 (9 Cir.1987) (persecution found by a single member of the armed forces, which the Duarte government cannot control "despite the staunchest efforts...." provided basis for well-founded fear); Bolanos-Heranandez v. INS, 767 F.2d at 1284 (applicant for asylum must show "[p]ersecution by the government or by a group which the government is unable to control."); see also McMullen v. INS, 658 F.2d 1312, 1315 n. 2 (9 Cir.1981) (in Sec. 243(h) proceeding persecution includes persecution by nongovernmental groups which the government is unable or unwilling to control).
 
 
 44
 Similarly, we do not think that M.A. must wait for international bodies such as the United Nations[6] to condemn officially the atrocities committed by a nation's military in order to be eligible for political asylum. Paragraph 171 of the Handbook shelters those individuals who do not wish to be associated with military action "condemned by the international community as contrary to basic rules of human conduct...." These basic rules are well documented and readily available to guide the Board in discerning what types of actions are considered unacceptable by the world community. The Geneva Conventions of August 12, 1949 represent the international consensus regarding minimum standards of conduct during wartime. They include the following, as to all of which M.A. has presented evidence to show their contravention by the Salvadoran military: the obligation to treat humanely persons taking no active part in hostilities, and the prohibition of certain acts, including violence to life and person, specifically murder of all kinds, mutilation, cruel treatment, and torture; and the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court. See Art. 3, Geneva Conventions of August 12, 1949, reprinted in United States Treaties and Other International Agreements Vol. 6, part 3 (1955).[7]
 
 
 45
 We hold that M.A. has made out a prima facie case that he merits refugee status and thus consideration for political asylum on the basis of his sincere refusal to participate in the actions of the Salvadoran Armed Forces, and the likelihood that he will be punished for his refusal to serve. We think that M.A. has presented the evidence to show "an objective situation" from which it can be inferred that "persecution is a reasonable possibility." Stevic, 467 U.S. at 424-425, 104 S.Ct. at 2498.
 
 
 46
 We have difficulty distinguishing Salim from the facts that M.A. has presented. In its interim decision in this case, Matter of A.G., the Board sought to distinguish Salim by stating that the rationale of its decision to grant refugee status to the Afghan draft evader Salim centered on Salim's refusal to serve in an army which was not controlled by his own government, but which was under Soviet command. We think that this explanation is inconsistent with the actual decision in Salim, as well as with the Handbook.
 
 
 47
 In Salim, the Board held that a claim of illegal "dragooning", in order to ensure an adequate number of soldiers to fight the soldiers' own compatriots, stated a claim beyond that of simple disregard of the draft laws of a nation. In the instant case, M.A. has presented evidence which shows that the Salvadoran military engages in lawless impressment of young men, and that it coerces them to commit acts against their fellow citizens which contravene the Geneva Conventions of August 12, 1949. Thus we think Salim supports our holding in this case. Furthermore, the Handbook does not distinguish between the atrocities committed by a military under the control of the "lawful" government of the people it terrorizes, or one under control of a foreign invader, and we think that it would be contrary to the spirit of the Refugee Act of 1980 to distinguish between atrocities committed by domestic forces and those committed by forces under foreign control, much less those under the control of a specific foreign government, e.g., the Soviet Union.[8]
 
 
 48
 It is true that the Board in Salim relied on a report prepared by the State Department Bureau of Human Rights and Humanitarian Affairs that concluded that Salim had established a well-founded fear. Of course such a report supporting an alien's contention should be given significant weight. We do not think however that the absence of such a report forecloses an applicant for asylum from showing by other evidence that he suffers from a well-founded fear of persecution.
 
 
 49
 To summarize: we think that M.A. has presented sufficient evidence to demonstrate that he could be singled out for persecution for his failure to serve in the military. He has shown that failure to serve results in an individual being labeled subversive. He has presented evidence to show that those whom the military designates subversive are often executed, and sometimes tortured. He has at least two relatives who were summarily executed shortly after demonstrating their opposition to government and military policies. He has established a prima facie case of a well-founded fear of persecution, and he should be given the opportunity to prove his case.
 
 
 50
 REVERSED AND REMANDED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 51
 Having studied with interest, and I hope attention, the majority opinion of Chief Judge Winter, I concur that M.A. has presented sufficient evidence to establish a prima facie case of a well-founded fear of persecution and so must be accorded the opportunity to prove his case. However, I find myself somewhat uneasy about the tone of the majority opinion and the indication to be derived from it that it goes perhaps a little farther than a bare finding of a prima facie case of persecution, to make an apparent assumption of justified draft evasion by M.A. because the military in El Salvador had committed acts condemned by the international community. Thereby, the opinion conveys the impression that M.A. has already to a substantial extent proven his case on the merits.
 
 
 52
 The majority opinion lists a variety of reasons to support, or possibly support its conclusion, while remaining silent about considerations pointing in the other direction. For example, it should not be ignored that M.A. entered the United States in 1982 without inspection, entering in an illegal immigrant status, while others in El Salvador, who presumably could have a case equally or more appealing than M.A.'s own, abided by the laws and did not slip secretly and illicitly across our borders.
 
 
 53
 Moreover, M.A., to reach the United States from El Salvador, had to cross, and perhaps for a time, reside in one or more countries (Mexico at a minimum) before entering the United States. Nothing is said about the possibility of refugee status in those other countries where M.A. was for a time and where probably, from a linguistic point of view, the countries as places of refuge would have been more advantageous to him than the predominantly English speaking United States. That would suggest M.A.'s motive was more to sneak in to the United States than simply to flee El Salvador.
 
 
 54
 In short, my concurrence merely acknowledges M.A.'s right to a further hearing. It in no way indicates how the ultimate result should turn out.
 
 
 
 [1]
 Carvajal-Munoz, which was decided before Cardoza-Fonseca, considered that the correct evidentiary burden for an applicant for political asylum was expressed in Kashani v. INS, 547 F.2d 376 (7 Cir.1977), which had concluded that a "well-founded fear" would "in practice converge" with the "clear probability" standard of Sec. 243. 743 F.2d at 574. Cardoza-Fonseca has clearly overruled this view, and to the extent that the evidentiary burden in Carvajal-Munoz was heightened because of its reliance on Kashani, we think that its articulated standard is too strict
 
 
 [2]
 It is impossible to quantify the requisite certainty of persecution necessary to support a well-founded fear. A 10 percent chance of torture or death gives an applicant for asylum a greater reason for fear than a 40 percent chance of a six-month prison sentence although the persecuting government may act in both cases out of identical political motives
 
 
 [3]
 The Refugee Act of 1980 was passed to bring the law of the United States in conformity with the United Nations treatment of refugees, and codifies United States obligations as a state party to the United Nations Protocol Relating to the Status of Refugees, January 31, 1967 (the Protocol) and the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 (the Convention, to which the U.S. is not a party, but which is incorporated in the Protocol). See INS v. Cardoza-Fonseca, 480 U.S. 421, 438-39 nn. 21 & 22, 107 S.Ct. at 1217 nn. 21 & 22, 94 L.Ed.2d 434, 452 nn. 21 & 22. Congress was therefore aware of the standards relating to the 1967 Protocol that had been developed by the UNHCR at the time it held its hearings on the Refugee Act. The Department of Justice has noted the likelihood that Congress intended the set of standards enunciated in the Handbook to serve as an interpretive guide to the Refugee Act of 1980: "We assume that Congress was aware of the criteria articulated in the Handbook when it passed the Act in 1980, and that it is appropriate to consider the guidelines in the Handbook as an aid to construction of the Act." U.S. Refugee Program: Oversight Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 24, 26 (1981) (Memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, to David Crossland, General Counsel, Immigration and Naturalization Service)
 
 
 [4]
 Whether valid reasons of conscience are alone sufficient to confer refugee status on a draft evader is left open by the Handbook. Where a nation (such as the United States) recognizes genuine ethical objections to the draft as a legitimate excuse for exemption from service, the Handbook recommends that refugees' claims be considered in light of such allowances. We do not reach this issue on the facts of this claim for political asylum
 
 
 [5]
 The Salvadoran constitution provides that all males between the ages of 18 and 30 are eligible for compulsory military service. M.A. is now 31, however, "in case of need, all Salvadorans suitable for performance of military tasks shall be soldiers." Another Salvadoran law requires that all Salvadoran men between the ages of 18 and 50 must serve in times of war. M.A. is thus still eligible under Salvadoran law for compulsory service, and could be a target of the random impressment of which he has presented evidence
 
 
 [6]
 The United Nations has "expressed deep concern at the situation of human rights in El Salvador," noting that as of 1985 "a situation of generalized warlike violence continues to exist, that the number of attacks on life and the economic structure remains a cause for concern, and that the number of political prisoners and abductions has increased." United Nations General Assembly Resolution No. 401139 (Dec. 13, 1985)
 The United Nations has also documented civilian casualties inflicted by the regular armed forces in El Salvador by the use of methods it found "genuinely disturbing." United Nations Economic and Social Council, Final Report on the Situation of Human Rights in El Salvador, submitted by Professor Jose Antonio Pastor Ridruejo in fulfillment of the mandate conferred under Commission resolution 1984/52 (February 1, 1985).
 
 
 [7]
 El Salvador is also a signatory to Protocol II (Protocols Additional to the Geneva Conventions of August 12, 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts, U.N. Doc. No A/32/144 reprinted by the International Red Cross (Geneva 1977)). Its specific protections include that "the civilian population as such, as well as individual civilians shall not be the object of attack. Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited." Part IV, Art. 13, p 2
 Documents detailing minimum standards of human rights other than in times of war include the Universal Declaration of Human Rights, and the International Covenant on Civil and Political Rights, reprinted in International Human Rights Instruments (R. Lillich ed. 1986).
 The United States is not a signatory to Protocol II, but has signed all four of the Geneva Conventions of August 12, 1949. It is therefore unclear that petitioner's second claim, that he should not be forced to return to a country which is regularly violating the Geneva Conventions of August 12, 1949, can be maintained. The Geneva Conventions of August 12, 1949 differ from Protocol II in that they protect those individuals who are endangered by international conflicts, while Protocol II protects potential victims of non-international conflict. Petitioner asks that we apply the norms of the Conventions which the United States have signed to a situation to which they do not explicitly extend, insofar as he claims that as a matter of law (rather than as a matter of guidance in interpreting the Refugee Act) it would violate the Conventions to return him to El Salvador.
 
 
 [8]
 The Refugee Act of 1980 was passed to improve and clarify the procedures for determining asylum claims, and required the Attorney General "to establish a uniform procedure for passing upon an asylum application." S.Rep. No. 256, 96th Cong., 2d Sess. 15-16, reprinted in 1980 U.S.Code Cong. & Admin.News 141, 155-56. In contrast, section 203(a)(7) (8 U.S.C. Sec. 1153(a)(7)), the former provision granting refugee status, vested authority in the Attorney General to make conditional entries available to aliens who "because of persecution or fear of persecution on account of race, religion, or political opinion ... have fled (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East...." All other claimants for political asylum were required to show that it was more probable than not that they would be persecuted, rather than that they suffered a well-founded fear of persecution. Thus a major result of the Refugee Act of 1980 was to eradicate the disparity of treatment based on geography