899 F.2d 304
 58 USLW 2589
 M.A. A26851062, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent,
Central American Refugee Center; Lawyers Committee for
Human Rights and Americas Watch; American Immigration
Lawyers Association; Asylum Appeals Program of the San
Francisco Lawyers Committee for Urban Affairs; National
Immigration Project of the National Lawyers Guild, Amici Curiae.
 No. 88-3004.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1989.
Decided March 27, 1990.
Rehearing In Banc Denied April 23, 1990.
 
 William Van Wyke, Washington, D.C. (argued) for petitioner.
 Mark Christopher Walters, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (argued) and John R. Bolton, Asst. Atty. Gen., Lauri Steven Filppu, Deputy Director, Joan E. Smiley, Asst. Director, Parker Singh, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (on brief), for respondent.
 
 
 1
 Monica C. Yriart, Cent. American Refugee Center, Steven G. Reade, Hadrian R. Katz, Andrew W. Shoyer, Darina C. McKelvie, Gwyn Firth Murray, Arnold & Porter, Washington, D.C. (on brief), for amicus curiae, Cent. American Refugee Center.
 
 
 2
 Arthur C. Helton, Laura B. Sherman, New York City (on brief), for amicus curiae, Lawyers Committee for Human Rights Americas Watch.
 
 
 3
 Lory D. Rosenberg, Cambridge, Mass., Lawrence Rudnick, Steel, Rubin & Rudnick, Philadelphia, Pa., for amicus curiae, American Immigration Lawyers Ass'n.
 
 
 4
 Kate T. McGrath, San Francisco, Cal. (on brief), for amicus curiae, Asylum Appeals Program of the San Francisco Lawyers Committee for Urban Affairs.
 
 
 5
 Carolyn P. Blum, University of California Law School, Berkeley, Cal. (on brief), for amicus curiae, Nat. Immigration Project of the Nat. Lawyers Guild, Inc.
 
 
 6
 Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, CHAPMAN, WILKINSON and WILKINS, Circuit Judges, and WINTER, Senior Circuit Judge, sitting en banc.
 
 WILKINSON, Circuit Judge:
 
 7
 In this case we consider the scope of the Board of Immigration Appeals' authority to deny an alien's request for asylum in the context of a motion to reopen deportation proceedings. On the eve of deportation, petitioner asked that his deportation proceedings be reopened so that he could request asylum under the Refugee Act of 1980, Pub.L. 96-212, 94 Stat. 102 (1980), based on his fear of persecution for refusing to serve in the Salvadoran military. An immigration judge denied petitioner's motion to reopen because he failed to present a prima facie case of eligibility for asylum, a reopening prerequisite. The Board of Immigration Appeals affirmed, and petitioner sought review from this court.
 
 
 8
 We hold that the Board's decision should be reviewed under an abuse of discretion standard, and that the Board did not abuse its discretion in denying petitioner's motion to reopen. We thus deny the petition and affirm the decision of the Board.
 
 I.
 
 9
 Petitioner M.A., a 31 year-old citizen of El Salvador, entered the United States illegally in February 1982. The Immigration and Naturalization Service (INS) brought deportation proceedings against him on February 22, 1984. At his deportation hearing, M.A. admitted that he entered the United States without inspection, conceded deportability, and requested that he be allowed to depart voluntarily. Through counsel, M.A. specifically indicated that El Salvador was his country of choice for deportation and that he had no fear of returning there. The immigration judge granted M.A. voluntary departure until September 16, 1984. However, M.A. failed to leave by then, and on January 15, 1985, the INS apprehended him for failing to report for deportation.
 
 
 10
 On January 21, the day before his scheduled deportation, M.A. claimed for the first time that he feared persecution in El Salvador based on his political and moral views. Through new counsel, M.A. filed a motion to reopen deportation proceedings and applied for asylum. The motion to reopen claimed ineffective assistance of former counsel as the reason for not presenting the asylum application before the close of deportation proceedings. The motion also requested 10 days to augment the asylum claim. The following day, an immigration judge denied the motion to reopen. The Board of Immigration Appeals (BIA) affirmed. However, this court reversed the BIA, holding that respondent had given a reasonable explanation for his failure to apply for asylum earlier, and that the immigration judge abused his discretion in denying M.A. a reasonable extension of time to supplement the motion to reopen.
 
 
 11
 On remand, M.A. presented a new petition for reopening with a renewed application for asylum and additional supporting evidence. In the petition, M.A. claimed that he left El Salvador "to avoid serving in its violent military." He alleged that the Salvadoran military, as part of the deliberate policy of the Salvadoran government, commits "systematic and widespread" human rights violations against the citizens of El Salvador. To corroborate his charges, M.A. relied heavily on numerous reports by private agencies and news organizations regarding the human rights violations perpetrated by the Salvadoran army. M.A. also claimed to have witnessed the results of this violence when he once passed through a morgue and saw "mutilated, decapitated, bruised, and gunned bodies."
 
 
 12
 Because of his conscientious political objection to these atrocities, M.A. desires to avoid military service in El Salvador. His claim for asylum rests on his fear that if he returns to El Salvador and fails to serve in the military, he will be tortured and possibly killed as an opposition sympathizer. To substantiate this fear, M.A. reiterates his general allegations about military violence in El Salvador. He further states that three relatives have been killed in connection with the Salvadoran conflict: one cousin was killed by the army for participation in an anti-government demonstration; another cousin was killed by the guerilla army; and his brother-in-law's brother was killed by a "death squad" for providing food to guerillas. In addition, he alleges that a member of the civilian patrol once threatened him and that he was twice beaten by soldiers.
 
 
 13
 The immigration judge denied the new motion to reopen because M.A. failed to make out a prima facie case for asylum eligibility, a prerequisite to reopening. After considering M.A.'s allegations in detail, the BIA agreed with the immigration judge and affirmed its order. The Board first noted the rule, recognized domestically and in international law, that it is not persecution for a country to require military service of its citizens. The Board then reasoned that M.A. failed to come within one of the narrow exceptions to this rule because he failed to show that the allegedly violent incidents to which he objected either represented the policy of the Salvadoran government or had been condemned by recognized governmental bodies. It also held that he failed to show that his military service would force him to be associated with the alleged atrocities, or that his refusal to serve would result in disproportionately severe punishment. Finally, the Board ruled that petitioner's claims were insufficient to make out the prima facie case of eligibility needed to reopen his proceedings because they lacked factual support and thus were "simply too speculative."
 
 
 14
 A panel of this court reversed the order denying reopening, holding that petitioner's allegations established the prima facie eligibility needed to justify reopening. M.A. A26851062 v. INS, 858 F.2d 210 (4th Cir.1988). This court granted rehearing en banc, and we now affirm the judgment of the BIA.
 
 II.
 
 15
 We must address at the outset the standard that governs our review of the Board's decision to deny M.A.'s motion to reopen his deportation proceedings. We hold that Board denials of motions to reopen for failure to establish a prima facie case of eligibility for asylum are to be reviewed under an abuse of discretion standard.
 
 
 16
 M.A. requests asylum under the Refugee Act of 1980, Pub.L. 96-212, 94 Stat. 102 (1980), which amended the Immigration and Nationality Act of 1952 ("INA"), Pub.L. No. 82-414, 66 Stat. 163. The Refugee Act of 1980 established for the first time a statutory basis for the grant of asylum to refugees already within the United States. See generally Anker & Posner, The Forty Year Crisis: A Legislative History of the Refugee Act of 1980, 19 San Diego L.Rev. 9, 11 (1981). Section 208(a) of the amended INA, 8 U.S.C. Sec. 1158(a), provides the Attorney General and his delegates[1] with discretion to grant asylum to an alien present in the United States if the alien satisfies the statutory definition of refugee.[2]
 
 
 17
 The INA defines "refugee" as one who is unable or unwilling to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. Sec. 1101(a)(42)(A).[3] Thus, asylum involves a two stage process: first, the immigration authorities determine statutory eligibility based on the "well-founded fear of persecution" standard; and second, if statutory eligibility is established, the Attorney General has discretion either to grant or to deny the alien's request for asylum. 8 U.S.C. Sec. 1158(a).
 
 
 18
 It is significant that M.A. requested asylum in the context of a motion to reopen finalized deportation proceedings. The immigration statutes do not require or even contemplate reopening procedures; instead, the Attorney General established them through regulations promulgated in his discretion under the immigration statutes. INS v. Rios-Pineda, 471 U.S. 444, 446, 105 S.Ct. 2098, 2100, 85 L.Ed.2d 452 (1985). When the Board adjudges a motion to reopen, it considers not the merits of the underlying claim, but rather whether new developments warrant rehearing the merits of that claim.
 
 
 19
 Under the pertinent regulations, a motion to reopen "shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. Sec. 3.2 (1989); see also 8 C.F.R. Sec. 3.8(a) (1989) ("Motions to reopen shall state the new facts to be proved at the reopened hearing and shall be supported by affidavits or other evidentiary material."). These regulations "apply to all motions to reopen, regardless of the underlying substantive basis of the alien's claim." INS v. Abudu, 485 U.S. 94, 105-06 n. 10, 108 S.Ct. 904, 912, n. 10, 99 L.Ed.2d 90 (1988). In addition, a petitioner like M.A., who requests reopening on the basis of a request for asylum, must "reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding." 8 C.F.R. Sec. 208.11 (1989). See Bahramnia v. INS, 782 F.2d 1243, 1245 (5th Cir.1986) (motion to reopen to request asylum must satisfy Secs. 3.2, 3.8, and 208.11).
 
 
 20
 Pursuant to these regulations, the BIA can deny a motion to reopen on any of three grounds:
 
 
 21
 First, it may hold that the movant has not established a prima facie case for the underlying substantive relief sought.... Second, the BIA may hold that the movant has not introduced previously unavailable, material evidence, 8 CFR Sec. 3.2, or, in an asylum application case, that the movant has not reasonably explained his failure to apply for asylum initially, 8 CFR Sec. 208.11.... Third, in cases in which the ultimate grant of relief is discretionary [including asylum cases] ... the BIA may leap ahead, as it were, over the two threshold concerns (prima facie case and new evidence/reasonable explanation), and simply determine that even if they were met, the movant would not be entitled to the discretionary grant of relief.
 
 
 22
 Abudu, 485 U.S. at 104-05, 108 S.Ct. at 911-12.
 
 
 23
 The Supreme Court has held that abuse of discretion is the appropriate standard of review for denials under the second and third grounds above. See id. at 105, 108 S.Ct. at 912. This case, though, involves the first ground stated above--a denial of a motion to reopen based on the alien's failure to establish prima facie eligibility. The Abudu Court explicitly declined to address the standard of review for such a denial. Id. at 104, 108 S.Ct. at 911. Here we address that question directly, and for the reasons stated below, we conclude that a BIA denial of a motion to reopen for lack of prima facie eligibility should be reviewed, like denials of motions to reopen deportation proceedings based on other grounds, under an abuse of discretion standard.
 
 
 24
 The reasons given by the Supreme Court for reviewing denials of reopening based on other grounds under an abuse of discretion standard apply with equal force to denials of reopening based on a lack of prima facie eligibility. First, as the language of the regulations makes manifest, reopening is an extraordinary remedy; the reopening procedures are designed to allow the Board to suspend final judgment and address the merits of an immigration claim in only the most clearly meritorious cases. Cf. INS v. Jong Ha Wang, 450 U.S. 139, 145, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981) (BIA denial of reopening should not be casually reversed since "the Government has a legitimate interest in creating official procedures for handling motions to reopen deportation proceedings so as readily to identify those cases raising new and meritorious considerations"). Accordingly, 8 C.F.R. Sec. 3.2, which governs all motions to reopen before the Board, is phrased negatively to state that motions to reopen "shall not be granted" unless certain showings are made. As the Supreme Court has recognized, the regulation "does not affirmatively require the Board to reopen the proceedings under any particular condition." Jong Ha Wang, 450 U.S. at 143-44 n. 5, 101 S.Ct. at 1030-31 n. 5.
 
 
 25
 Because the immigration statutes do not contemplate reopening, and because "the Attorney General's regulations ... plainly disfavor motions to reopen," Abudu, 485 U.S. at 110, 108 S.Ct. at 915, a denial under the reopening regulations must be reviewed with extreme deference. See Sang Seup Shin v. INS, 750 F.2d 122, 131 (D.C.Cir.1984) (Starr, J., dissenting) ("The Board's discretion ... is at its zenith in making a discretionary procedural determination [under the reopening regulations] which Congress did not see fit to enact."). Broad deference is especially warranted here, where the basis of the denial--failure to establish prima facie eligibility for political asylum--is itself not explicitly provided for in the regulations, but rather is the Board's interpretation of the requirements of the regulations. See Dolores v. INS, 772 F.2d 223, 225 (6th Cir.1985). As an interpretation of its own regulations, the Board's "prima facie" basis for denying a motion to reopen is entitled to extraordinary respect. See Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).
 
 
 26
 The generous deference we must normally accord an agency's interpretations of its own regulations is even more appropriate here because the regulations concern reopening of completed administrative proceedings. Motions to reopen administrative proceedings are strongly disfavored because of the threat they pose to finality. See Abudu, 485 U.S. at 107-08, 108 S.Ct. at 913; Rios-Pineda, 471 U.S. at 450-51, 105 S.Ct. at 2102-03, Jong Ha Wang, 450 U.S. at 143-44 & n. 5, 101 S.Ct. at 1030-31 & n. 5. The Abudu Court explained this "strong public interest in bringing litigation to a close" as follows:
 
 
 27
 If INS discretion is to mean anything, it must be that the INS has some latitude in deciding when to reopen a case. The INS should have the right to be restrictive. Granting such motions too freely will permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts sufficient to establish a prima facie case.
 
 
 28
 Abudu, 485 U.S. at 107-08, 108 S.Ct. at 913 (quoting Villena v. INS, 622 F.2d 1352, 1362 (9th Cir.1980) (en banc) (Wallace, J., dissenting)). The Abudu Court likened a motion to reopen in the deportation context to a petition for rehearing or a motion for new trial on the basis of newly discovered evidence, 485 U.S. at 107, 108 S.Ct. at 913, both of which are reviewed with extreme caution and deference. See, e.g., Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 294-96, 95 S.Ct. 438, 446-47, 42 L.Ed.2d 447 (1974) (party seeking reopening of an administrative proceeding bears a "heavy burden," and the courts must not order reopening "except in the most extraordinary circumstances"); United States v. Tucker, 836 F.2d 334, 336 (7th Cir.1988) (new trial only if newly discovered evidence "would probably lead to an acquittal in the event of a trial").
 
 
 29
 Finally, in reviewing the Board's denial of a motion to reopen deportation proceedings, we must be sensitive to the inherently political nature of the decision whether or not to deport. "[T]he INS is the agency primarily charged by Congress to implement the public policy underlying [the immigration] laws" and "[a]ppropriate deference must be accorded to its decisions." INS v. Miranda, 459 U.S. 14, 19, 103 S.Ct. 281, 284, 74 L.Ed.2d 12 (1983). "INS officials must exercise especially sensitive political functions that implicate questions of foreign relations, and therefore the reasons for giving deference to agency decisions on petitions for reopening ... in other administrative contexts apply with even greater force in the INS context." Abudu, 485 U.S. at 110, 108 S.Ct. at 195 (citation omitted).
 
 
 30
 The arguments for a deferential abuse of discretion standard are thus multitudinous and compelling. Nonetheless, petitioner and amici suggest that because the Board's denial of a motion to reopen based on a lack of prima facie eligibility turns on application of the statutory standard of asylum eligibility, it should be reviewed de novo.
 
 
 31
 This argument lacks merit. The term "prima facie case" is not a buzzword that requires us to ignore the procedural posture of the case--a motion to reopen completed proceedings pursuant to regulations passed by the grace of the implementing agency--and go back to square one. It is true that the "prima facie" standard used to determine whether a decision should be reopened may turn on many of the same factors used to determine prima facie eligibility under the statute. However, in the reopening context the statutory language is not used to determine statutory eligibility for asylum, the purpose for which Congress enacted the "well-founded fear" standard. Instead, the immigration authorities have interpreted their reopening regulations to incorporate statutory language for a purpose specific to the regulations themselves, namely, the determination of whether new claims are sufficiently meritorious to warrant reconsidering a completed case.
 
 
 32
 The Board has made clear that the "prima facie" test in the reopening context is different from the prima facie test in an original proceeding, is limited to the regulations themselves, and is more difficult to satisfy than statutory eligibility:
 
 
 33
 The prima facie showing [in the reopening context] includes not only that there is a reasonable likelihood that the statutory requirements for the relief sought are satisfied, but also a reasonable likelihood that a grant of relief may be warranted as a matter of discretion.
 
 
 34
 Marcello v. INS, 694 F.2d 1033, 1035 (5th Cir.1983) (emphasis added), citing Matter of Rodriguez, Interim Decision No. 2727 (BIA 1979); see also Matter of Reyes, 18 I & N Dec. 249 (BIA 1982). There is nothing incongruous about the Board interpreting its regulations to require that a prima facie showing in a reopening context be more demanding than the statutory standard in an original proceeding, for it is well established that under its reopening regulations "the BIA has discretion to deny a motion to reopen even if the alien has made out a prima facie case for relief." Abudu, 485 U.S. at 105-06, 108 S.Ct. at 911-12. Indeed, even though it did not explicitly rule on the issue, the Supreme Court in Abudu recognized that "the prima facie case issue on reopening" can include discretionary factors and can be more difficult to satisfy than a prima facie case in an original proceeding. Id. at 109 n. 14, 111, 108 S.Ct. at 914 n. 14, 915.
 
 
 35
 We thus refuse to impose the proposed de novo standard of review on the Board's denials of reopening based on "prima facie" grounds. We must affirm the Board's denial of a motion to reopen unless it "(1) was made without a rational explanation, (2) inexplicably departed from established policies, or (3) rested on an impermissible basis such as invidious discrimination against a particular race or group." Oviawe v. INS, 853 F.2d 1428, 1431 (7th Cir.1988) (citing Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir.1985)); see also Williams v. INS, 773 F.2d 8, 9 (1st Cir.1985); Balani v. INS, 669 F.2d 1157, 1161 (6th Cir.1982). This standard is not difficult to satisfy: "The [BIA's] decision need only be reasoned, not convincing." El-Gharabli v. INS, 796 F.2d 935, 937 (7th Cir.1986).
 
 
 36
 The principles of discretion discussed above also lead us to reject petitioner's formulation of his evidentiary burden. Petitioner argues, and the original panel held, 858 F.2d at 216, that in considering a motion to reopen, the Board and this court must not only accept petitioner's alleged facts as true, but must also view them in the light most favorable to him, drawing every inference in his favor. This standard, which is more akin to summary judgment than reopening, is inappropriate here. The Abudu Court stated that "an alien who has already been found deportable has a much heavier burden when he first advances his request for asylum in a motion to reopen." 485 U.S. at 111, 108 S.Ct. at 915. Accordingly, Abudu rejected the summary judgment model in reopening procedures and disclaimed the notion "that all ambiguities in the factual averments must be resolved in the movant's favor." Id. at 109-10, 108 S.Ct. at 914-15. Any other rule would effectively overwhelm the immigration authorities, perhaps the most heavily burdened officers in our government, by allowing aliens to bring eleventh hour appeals in an attempt to delay deportation. See Rios-Pineda, 471 U.S. at 450, 105 S.Ct. at 2102 (aliens have substantial incentives to prolong litigation for the sake of delaying deportation). Accordingly, we reject petitioner's argument that, in a reopening context, every inference must be drawn in his favor.
 
 
 37
 With these principles in mind, we turn to consider the Board's decision.III.
 
 
 38
 The Board held that M.A. failed to establish the prima facie case of a "well-founded fear of persecution" needed to warrant reopening because he failed to show that a reasonable person in his circumstances could have feared persecution if he were returned to El Salvador. We hold that the adoption of the "reasonable person" standard was entirely appropriate and that the Board did not abuse its discretion in applying the standard to the facts of M.A.'s case.
 
 A.
 
 39
 As the Supreme Court has noted, the term "well-founded fear" requires an examination both of the subjective feelings of the applicant for asylum and the objective reasons for the applicant's fear. INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987). The Board applied a "reasonable person" approach to define the nature of the objective evidence that must be adduced to render the subjective fear of persecution "well-founded." Under this approach, an applicant for asylum establishes a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution if he were returned to his native country. See Matter of Mogharrabi, Interim Decision No. 3028 (BIA 1987); Guevara Flores v. INS, 786 F.2d 1242 (5th Cir.1986).
 
 
 40
 The "reasonable person" approach is faithful to the language of the Refugee Act. The statutory requirement that M.A.'s fear be "well-founded" means that his fear "must have some basis in the reality of the circumstances; mere irrational apprehension is insufficient...." Guevara Flores, 786 F.2d at 1249; see also Blanco-Comarribas v. INS, 830 F.2d 1039, 1042 (9th Cir.1987). To validate the "well-foundedness" of his fear, M.A. must set forth specific, concrete facts. See, e.g., Sanchez-Trujillo v. INS, 801 F.2d 1571, 1574 (9th Cir.1986). These specific allegations must show a fear of "persecution." The Refugee Act tightly defines the parameters of cognizable persecution. It allows eligibility for political asylum only if the persecution M.A. fears takes place "on account of" his "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. Sec. 1101(a)(42)(A).
 
 
 41
 The Board's "reasonable person" test is also consistent with the pronouncements of the Supreme Court. A reasonable person could set forth objective evidence of a well-founded fear of persecution without having to show that persecution will probably result. Thus the "reasonable person" approach respects the Supreme Court's admonition that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. at 1213. See also INS v. Stevic, 467 U.S. 407, 424-25, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984) ("[S]o long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.").
 
 
 42
 Finally, this circuit has already adopted much the same approach to the term "well-founded fear" as the Board:
 
 
 43
 [T]he "well-founded fear" test requires the alien to establish that he has a subjective fear of returning and that this fear has enough of a basis in specific facts to be considered "well-founded" upon objective evaluation. The alien must offer "specific facts " detailing a "good reason " to fear persecution, or establishing an objectively reasonable "expectation of persecution."
 
 
 44
 Cruz-Lopez v. INS, 802 F.2d 1518, 1522 (4th Cir.1986) (citations omitted) (emphasis added).[4] See also Carcamo-Flores v. INS, 805 F.2d 60, 68 (2d Cir.1986); Cardoza-Fonseca v. INS, 767 F.2d 1448, 1453 (9th Cir.1985), aff'd, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); Carvajal-Munoz v. INS, 743 F.2d 562, 574 (7th Cir.1984).
 
 B.
 
 45
 The Board did not abuse its discretion in denying M.A.'s motion to reopen for failure to establish prima facie eligibility for political asylum. It properly focused upon the fact that, at bottom, M.A. was a draft resister who claimed that his justified refusal to serve in the Salvadoran military would result in his persecution. International law and Board precedent are very clear that a sovereign nation enjoys the right to enforce its laws of conscription, and that penalties for evasion are not considered persecution. See Selective Draft Law Cases, 245 U.S. 366, 378, 38 S.Ct. 159, 162, 62 L.Ed. 349 (1918). See also Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status Sec. 167 (Geneva, 1979) ("Handbook ").[5]
 
 
 46
 The Board also properly acknowledged that an exception to this rule will be recognized and an alien will be considered eligible for asylum in those rare cases in which either (1) the alien would be associated with a military whose acts are condemned by the international community as contrary to the basic rules of human conduct, or (2) refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment on account of one of the five grounds enumerated in section 1101(a)(42)(A) of the Refugee Act. See Handbook Secs. 169, 171. As we show in the remainder of this subsection and in the next, the Board was clearly acting within its discretion in ruling that M.A.'s allegations fell short of the prima facie showing needed to come within either exception.
 
 
 47
 M.A. claims that the military in which he might be forced to serve has committed acts that are contrary to the basic rules of human conduct. The Board was within its discretion in rejecting this claim based on M.A.'s failure to present cognizable evidence that the alleged atrocities he wanted to avoid were perpetrated as a result of the policies of the Salvadoran military or government. Misconduct by renegade military units is almost inevitable during times of war, especially revolutionary war, and a country as torn as El Salvador will predictably spawn more than its share of poignant incidents. Without a requirement that the violence be connected with official governmental policy, however, any male alien of draft age from just about any country experiencing civil strife could establish a well-founded fear of persecution. The Refugee Act does not reach this broadly. See Sanchez-Trujillo v. INS, 801 F.2d at 1577.
 
 
 48
 M.A. did, of course, bring forth evidence from prominent private organizations such as Amnesty International and Americas Watch. These organizations have condemned the Salvadoran military and security forces for committing violent acts against all sectors of Salvadoran society. They report that the Salvadoran military engages in "extrajudicial execution on noncombatant civilians, individual death squad-style killings, 'disappearances,' arbitrary detention and torture." Moreover, they contend that the military violence is carried out pursuant to a deliberate policy of the Salvadoran government designed to further that government's political interests.
 
 
 49
 The Board refused to recognize these private reports and instead suggested, consistent with the Handbook Sec. 171 (violent action must be "condemned by the international community as contrary to basic rules of human conduct"), that such condemnation must at a minimum come from "recognized international governmental bodies." Petitioner and amici argue, however, and the panel agreed, 858 F.2d at 218, not only that the atrocities need not be the policy of the Salvadoran government, but also that an alien need not wait for official condemnation by governmental bodies of any kind before the atrocities can be considered as the basis for a "well-founded fear."
 
 
 50
 We disagree. A standard of asylum eligibility based solely on pronouncements of private organizations or the news media is problematic almost to the point of being non-justiciable. Neither petitioner nor amici state the extent of general violence by military units needed to be reported by private groups in order to constitute "international condemnation." We do not know how courts are expected to evaluate the proffered explanations for various incidents of military activity or to gauge the extent to which such activity may or may not implicate official policies. We are also uncertain of the criteria by which courts would analyze the reports of private groups. Presumably, if any private organization condemns the acts of some members of the military in a country at war, these condemnations would serve as the basis for asylum eligibility. Although we do not wish to disparage the work of private investigative bodies in exposing inhumane practices, these organizations may have their own agendas and concerns, and their condemnations are virtually omnipresent. Taken alone, they do not suffice to overturn the Board's judgment in M.A.'s case.[6] See Mendez-Efrain v. INS, 813 F.2d 279, 282 (9th Cir.1987) ("documentary evidence on the tragic and widespread danger of violence and human rights violations affecting all Salvadorans ... is not enough to establish persecution").
 
 
 51
 It is, of course, the role of private organizations and news reports to energize the political branches. But that is quite a different thing from requiring the courts in each instance to evaluate independently the accusations of private organizations to determine whether they set forth conditions adequate to overturn the Board's discretionary judgment. This responsibility would require us to make immigration decisions based on our own implicit approval or disapproval of U.S. foreign policy and the acts of other nations. Courts could be put in the position of ruling, as a matter of law, that a government whose actions have not been condemned by international governmental bodies engages in persecution against its citizens. "[T]o accept the claim of someone to qualify for refugee status is publicly to accuse some other state of engaging in persecution." Whelan, Principles of U.S. Immigration Policy, 44 U.Pitt.L.Rev. 447, 479-80 (1983). Such a role for the courts would transform the political asylum process from a method of individual sanctuary left largely to the political branches into a vehicle for foreign policy debates in the courts.
 
 
 52
 The federal courts lack the expertise, and, more importantly, the constitutional authority, to assume such a role. Numerous Supreme Court decisions recognize the intimate connection between immigration decisions and foreign policy, and, based on separation of powers principles, reject a significant role for the courts in these political matters. See, e.g., Abudu, 485 U.S. at 110, 108 S.Ct. at 914; Hampton v. Mow Sun Wong, 426 U.S. 88, 101-02 n. 21, 96 S.Ct. 1895, 1904-05, 48 L.Ed.2d 495 (1976); Kleindienst v. Mandel, 408 U.S. 753, 767, 92 S.Ct. 2576, 2584, 33 L.Ed.2d 683 (1972); Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895); Fong Yue Ting v. United States, 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893). Many of the same " 'constitutional' underpinnings" that inform the act of state doctrine, see Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964), which restrains federal courts from examining the validity of the public acts of a sovereign government executed within its territory, see Restatement (Third) of Foreign Relations Law Sec. 443 (1987), apply here. See Kaveh-Haghigy v. INS, 783 F.2d 1321, 1323 (9th Cir.1986) (rejecting an asylum claim similar to M.A.'s because "[a]bsent exceptional circumstances, it is not the place of the judiciary to evaluate the political justifications of the actions of foreign governments").
 
 
 53
 We thus reject petitioner's invitation to join the political branches in the articulation of foreign policy under the rubric of discerning a "well-founded fear of persecution." The Board's suggestion that the violence be condemned at a minimum by international governmental bodies renders inapplicable the cases cited by M.A. which hold that a showing of persecution by the government is unnecessary if the government cannot control the group perpetrating the violence. See, e.g., Bolanos-Hernandez v. INS, 767 F.2d 1277, 1284 (9th Cir.1985); McMullen v. INS, 658 F.2d 1312, 1315 n. 2 (9th Cir.1981). Unless the government's non-action has been condemned by a recognized public governmental body, the inquiry into the government's "control" over forces within its borders would place us in precisely the political posture that we have attempted to avoid.
 
 
 54
 It is well, in dealing with what is essentially an evidentiary matter, that the standards laid down by courts not be hard and fast. It would be imprudent for us to suggest that an absence of official international condemnation must invariably defeat each and every claim for political asylum. Similarly, we do not hold that the presence of such condemnation will automatically establish such a claim. To speak in such absolutes would be to substitute our judgment for that of the Board. To formulate general legal prescriptions for all the claims of asylum that might conceivably arise would also preempt the Board in assessing the evidence in such cases. The term "well-founded fear ... can only be given concrete meaning through a process of case-by-case adjudication," and "the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." Cardoza-Fonseca, 480 U.S. at 448, 107 S.Ct. at 1221. The fact that the Attorney General has ultimate discretion to deny an application for asylum thus does not detract from our duty to pay proper deference to his judgments--and those of his delegates--concerning asylum eligibility. Here we decline to disturb their method of assessing M.A.'s grievances about the Salvadoran government.
 
 C.
 
 55
 The Board finally rejected M.A.'s petition on the ground that it failed to bring forth evidence to show that his refusal to serve in the army would result in persecution. As the Board stated the matter, "[a]lthough [M.A.] has presented evidence to show that many have been murdered by so-called death squads for suspected anti-government sympathies, he has not supported the contention that mere failure to serve in the military is the kind of activity which draws the attention of the persons who carry out these killings."
 
 
 56
 In short, M.A. has failed to show that he would be singled out for his refusal to serve. See Sanchez-Trujillo, 801 F.2d at 1574; Carvajal-Munoz v. INS, 743 F.2d 562, 574 (7th Cir.1984). He presents no evidence whatsoever that either the government or the guerillas have a particular interest in him. At most, his claims amount to a fear that he may be the object of the general violence incidental to the civil war in El Salvador. However, the Refugee Act of 1980 does not provide asylum eligibility for anyone who may be subject to violence in his home country. Rather, the persecution for which the Act provides asylum must be "on account of" one of five impermissible reasons. 8 U.S.C. Sec. 1101(a)(42)(A). For this reason, courts have consistently rejected applications for political asylum based on fear grounded in general violence or unrest in one's native country. See, e.g., Mendez-Efrain, 813 F.2d 279, 282 (9th Cir.1987); Kaveh-Haghigy, 783 F.2d at 1323.
 
 
 57
 M.A.'s own allegations make clear that his fear is grounded in nothing more than the generally violent conditions extant in El Salvador. In substantiating the basis for his "well-founded fear," M.A. noted that he had relatives killed by both the Salvadoran army and the guerillas. The threat he fears thus appears endemic to the entire Salvadoran population; it certainly does not amount to a specific threat directed towards him on account of an impermissible statutory factor. Similarly, M.A.'s alleged beatings, though deeply unfortunate, do not constitute persecution as it has been defined by the Congress in 8 U.S.C. Sec. 1101(a)(42)(A) (recognizing asylum eligibility only for persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion"). We have no quarrel, of course, with M.A.'s assertion that "the significance of a specific threat to an individual's life or freedom is not lessened by the fact that the individual resides in a country where the lives and freedom of large numbers of people are threatened," citing Bolanos-Hernandez, 767 F.2d at 1285. What we reject is the notion, pressed by petitioner and accepted by the panel, that assertions like M.A.'s of general violence alone can satisfy the requirement of an individualized threat of persecution. See Ganjour v. INS, 796 F.2d 832, 837 (5th Cir.1986) (general information about violent conditions no substitute for "specific information relating to ... fear of persecution"). M.A.'s petition fails to allege an individualized threat of persecution with even the specificity of the petitioner in Cruz-Lopez, whose asylum eligibility claim, in a procedural posture much more favorable to the alien than here, we rejected. 802 F.2d at 1522.
 
 
 58
 In addition, M.A. fails to present any evidence that he is a member of a group that faces some likelihood of persecution. He does not claim to be a member of any political organization, and concedes that he has "not ... engaged in a lot of political activity." Moreover, his potential membership in the class of draft-eligible males does not suffice. The Board's decision is consistent with numerous court of appeals decisions that reject claims by military-age males that they constitute a "particular social group" within the meaning of the Refugee Act. See, e.g., Sanchez-Trujillo, 801 F.2d at 1575-77. These decisions reflect the courts' concern over both the incentives for draft-age males to raise asylum claims and the impact on our relations with foreign nations if we were to overrule the Board's decision and shelter aliens seeking to avoid military obligations abroad. See id. at 1576-77 (rejecting claim that military age males qualify for asylum as a social group because to so hold "would be tantamount to extending refugee status to every alien displaced by general conditions of unrest or violence in his or her home country").
 
 
 59
 Finally, M.A. claims that he is "not ... strongly politically oriented" and does "not want to fight for either side in this civil war." His status as a political "neutral" is, however, irrelevant. It is unclear whether neutrality can be considered a "political opinion" within the meaning of the Refugee Act. The Ninth Circuit has ruled that it can in some circumstances, see Bolanos-Hernandez, 767 F.2d at 1286, and this circuit has declined either to accept or reject the position, Cruz-Lopez, 802 F.2d at 1520 n. 3. However, even the Ninth Circuit requires that a person seeking to establish a "well-founded fear" on account of an opinion of neutrality must show that he has affirmatively made a decision to remain neutral, and has received some threat or could be singled out for persecution on account of the opinion of neutrality. See Arteaga v. INS, 836 F.2d 1227, 1231-32 & n. 8 (9th Cir.1988); see also Matter of Vigil, Interim Decision No. 3050 (BIA 1988). M.A. has brought forward no evidence to show that the persecution he fears--if indeed the object of his fear can appropriately be called persecution, rather than random violence--has anything to do with his "neutral" political opinions.
 
 IV.
 
 60
 In essence, M.A.'s claims reflect a distaste for the Salvadoran government and a fear of the general violence in that country as a result of its civil conflict. In rejecting his claims, we do not mean to minimize the conditions existing in El Salvador, or the suffering that civil strife has brought upon the people of that country. One may sympathize with M.A.'s desire not to return to war-torn El Salvador, see Cruz-Lopez, 802 F.2d at 1519, but the Refugee Act does not recognize asylum eligibility for those in his situation.
 
 V.
 
 61
 For the foregoing reasons, this petition for review is denied and the decision of the Board of Immigration Appeals is AFFIRMED.
 
 
 62
 HARRISON L. WINTER, Senior Circuit Judge, dissenting:
 
 
 63
 I persist in my view, expressed in the original majority opinion in M.A. A26851062 v. INS, 858 F.2d 210 (4 Cir.1988) (M.A. I ), that petitioner established a prima facie case of a well-founded fear of persecution and that he should be given the opportunity to prove his case. Thus, I can neither subscribe to the majority's excessive deference to the Board nor to its overly rigid formulation of the well-founded fear of persecution standard. Accordingly, I respectfully dissent. I find it necessary to supplement what was said in the panel opinion and to document wherein the majority errs.
 
 I. The Case For De Novo Review
 
 64
 My first disagreement with the majority concerns the standard of review that should govern determinations of prima facie eligibility by the Board of Immigration Appeals (BIA or Board). In its powerful march toward establishing an abuse of discretion standard, the majority has overemphasized the procedural context of the case and underemphasized the purely legal issue presented to us by the Board: has the petitioner adduced sufficient evidence to establish a prima facie case of refugee eligibility under 8 U.S.C. Secs. 1158(a), 1101(a)(42)(A) (1982)?
 
 A.
 
 65
 As the majority points out, the BIA can deny a motion to reopen (1) by holding that a movant has not established a prima facie case for asylum; (2) by holding that the movant has not introduced previously unavailable, material evidence or reasonably explained his failure to apply for asylum initially; or (3) by "leap[ing] ahead" and determining that even if the first two requirements were met, "the movant would not be entitled to the discretionary grant of relief." INS v. Abudu, 485 U.S. 94, 105, 108 S.Ct. 904, 912, 99 L.Ed.2d 90 (1988). Had the Board exercised its discretionary authority in denying M.A.'s application on the second or third ground,[1] our review would of course be greatly circumscribed. Abudu, 485 U.S. at 105, 108 S.Ct. at 912; INS v. Rios-Pineda, 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985). Similarly, had the Board denied the petition because it found the alien's evidence or affidavits "inherently unbelievable," our review would be limited. Haftlang v. INS, 790 F.2d 140, 143 (D.C.Cir.1986) (Board may "weed out" meritless motions to reopen when they are conclusory or inherently unbelievable).
 
 
 66
 But the Board did not exercise its discretionary authority in denying M.A.'s petition. Indeed, we had closed off the second avenue of denial when we ruled that M.A. had reasonably explained his failure to apply for asylum at his original hearing. Alvarez v. INS, No. 85-1221 (4 Cir. Jan. 24, 1986) (unpublished). Rather, the Board restricted its decision to whether M.A. had established a prima facie case of eligibility for refugee status, i.e., whether M.A. had a well-founded fear of persecution. In determining that M.A. had not established a prima facie case, the Board confined itself to an analysis of Sec. 1101(a)(42)(A), the United Nations High Commissioner for Refugees (UNHCR), Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979) [hereinafter Handbook ], and the Supreme Court's decision in INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Using these sources, the Board concluded that, in order for a person in M.A.'s situation to become eligible for refugee status, he must show (1) a formal government policy calling for the commitment of atrocities by the military in question, (2) condemnation of the military action in question by international governmental bodies, and (3) that, as a member of the armed forces, he would engage personally in atrocities.
 
 
 67
 When an administrative agency declines to use its discretionary authority, but instead formulates new legal rules based on an interpretation of a congressional statute, a Supreme Court decision, and a document recognized as an authoritative source in understanding our international refugee obligations, we owe that agency considerably less deference than if that agency had made factual or credibility determinations. See Cardoza-Fonseca, 480 U.S. at 447-48, 107 S.Ct. at 1220-21 (" 'The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.... If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.' ") (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984));[2] Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 49 (2 Cir.1976) (Friendly, J.) ("there is an impressive body of [Supreme Court jurisprudence] sanctioning free substitution of judicial for administrative judgment when the question involves the meaning of a statutory term"), aff'd sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); 5 K. Davis, Administrative Law Treatise Sec. 30:00 (Supp.1982) (agency's interpretation of a statutory term is an appropriate area for the court to exercise its own independent judgment).
 
 
 68
 In my view, our role here is analogous to that of the Ninth Circuit in Maldonado-Cruz v. INS, 883 F.2d 788 (9 Cir.1989). There, the Board dismissed the asylum application of a politically neutral El Salvadoran, holding as a matter of law that his fear of persecution by the military was not persecution on account of political opinion. The BIA based its decision solely on a legal interpretation of Sec. 1101(a)(42)(A), and did not question the petitioner's evidence or credibility. On review, the Ninth Circuit concluded that "[b]ecause resolution of this matter involves a question of law, we review the decision of the BIA de novo." 883 F.2d at 791. See also Rodriguez-Rivera v. INS, 848 F.2d 998, 1001 (9 Cir.1988) ("We review questions of law, such as whether the BIA applied the appropriate legal standard [in determining refugee status], de novo."); Lazo-Majano v. INS, 813 F.2d 1432, 1434 (9 Cir.1987) (when Board does not doubt evidence, but instead reaches its "unfavorable decision on the basis that [the alien] had not met the legal requirements of the applicable statutes," we review this determination de novo).
 
 
 69
 Significantly, the Ninth Circuit has utilized the same standard of review when the question of prima facie eligibility has arisen in the reopening context. In Ghadessi v. INS, 797 F.2d 804 (9 Cir.1986), the court stated that "when the BIA restricts its decision, as here, to whether the alien has established a prima facie case, this is the only basis for the decision that we review." 797 F.2d at 805. This determination, the court concluded, is "nondiscretionary" and so the court's review was "limited to considering whether the BIA's 'determination concerning the prima facie case is correct.' " Id. at 805, 806 (quoting Larimi v. INS, 782 F.2d 1494, 1496 (9 Cir.1986)) (emphasis in original). The Abudu decision has not changed the Ninth Circuit's standard of review. See Shafiei v. INS, 877 F.2d 64 (9 Cir.1989) (unpublished) (applying Ghadessi standard and overturning BIA ruling on prima facie eligibility).
 
 B.
 
 70
 The majority next asserts that de novo review is especially inappropriate in the reopening context because reopening "is an extraordinary remedy" which threatens the Board's interest in finality and repose. I am certain that by utilizing our independent judgment of Board determinations of prima facie eligibility, we threaten neither of these important interests. As Judge Wright of the District of Columbia Circuit has stated, the establishment of a prima facie case "serves a screening function by ensuring that only those cases in which facts are alleged and supported that are legally sufficient to support a finding of eligibility for asylum will be reopened." Haftlang, 790 F.2d at 143. As part of this "screening" process, the Board possesses the authority (and almost the unfettered discretion) to deny reopening to those applicants who have not satisfactorily explained their dilatoriness, presented new evidence, or convinced the Board that they ultimately will prevail on the merits. To me, these safeguards make it quite difficult to reopen proceedings and thus address the Board's concerns with "bringing litigation to a close." Cf. Yamada v. INS, 384 F.2d 214, 217 (9 Cir.1967) (petitions to reopen are "protected from abuse" by regulations that restrict the grant of a reopening to cases where new evidence offered). Because it is the rare case where the applicant manages to leap over the first hurdle and explain his failure to apply for asylum initially or present new material evidence, and the Board then forgoes its discretionary option of denying the motion and rules on his prima facie case, de novo review of that determination will only minimally affect the reopening process. Cf. Immigration Law And Business Sec. 10.5(e)(3), at 10-37 (1989) ("Questions of statutory construction rarely arise with regard to motions to reopen ... because the Board may properly decide that the relief sought would not be granted even assuming statutory eligibility because discretion would not be exercised in favor of the alien.").
 
 
 71
 Similarly unconvincing is the majority's ruling that the test for prima facie eligibility in the reopening context is different from the prima facie test in an initial proceeding. Except for the one case cited for this proposition, Marcello v. United States, 694 F.2d 1033 (5 Cir.), cert. denied, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983), which in my view mistakenly conflated the distinction between denying a motion to reopen on discretionary grounds and determining bare statutory eligibility, all of the cases that discuss the prima facie standard do not distinguish between the reopening and initial hearing context. See, e.g., Corado-Rodriguez v. INS, 828 F.2d 622, 625-27 (9 Cir.1987) (standards of proof for prima facie case on motion to reopen identical to those on initial hearing); Hernandez-Ortiz v. INS, 777 F.2d 509, 513 (9 Cir.1985) ("prima facie case is established when an alien presents [evidence], which, if true, would satisfy the requirements for substantive relief"); Jong Ha Wang v. INS, 622 F.2d 1341, 1346 (9 Cir.1980) (en banc) (eligibility for relief "therefore ma[kes] out a 'prima facie' case"), rev'd on other grounds, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981).[3] Consequently, I view the legal requirements for refugee eligibility as identical regardless of when the asylum claim is presented.
 
 C.
 
 72
 The majority's final reason for heightened deference is contained in its statement that "we must be sensitive to the inherently political nature of the decision whether or not to deport." Maj. Op. at 309. It is precisely the politicization of the asylum process that troubles me, and suggests that heightened deference to the Board is unwarranted. As the Cardoza-Fonseca Court declared, an agency's interpretation of a relevant provision that conflicts with its earlier interpretation is " 'entitled to considerably less deference' than a consistently held agency view." 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 (quoting Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1689, 68 L.Ed.2d 80 (1981)). A study of the asylum-granting process reveals that the Board interprets the well-founded fear standard inconsistently, and in violation of the mandate of the Refugee Act of 1980.
 
 
 73
 Under prior immigration law, those seeking asylum were admitted to the United States under the "seventh preference" category. See Immigration and Nationality Act, Sec. 203(a)(7), 8 U.S.C. Sec. 1153(a)(7) (1952) (repealed in 1980). This preference category provided refugee status only to those fleeing from persecution in a communist or "communist-dominated" country, or within the general area of the Middle East. See generally T. Aleinikoff & D. Martin, Immigration: Process And Policy 638-642 (1985) (explaining history of U.S. refugee protections). Despite the signing in 1967 of the treaty entitled "United Nations Protocol Relating to the Status of Refugees,"[4] which imposed upon the signatories an international commitment not to return refugees to a country where they would face persecution, the U.S. continued to apply its ideologically-biased refugee provision under the seventh preference category. In 1980, with the enactment of the Refugee Act of 1980, Pub.L. No. 96-212, 94 Stat. 102, all traces of ideological bias were removed, and refugee status was bestowed upon anyone that met the requirements of 8 U.S.C. Sec. 1101(a)(42)(A). See Cardoza-Fonseca, 480 U.S. at 421, 107 S.Ct. at 1207 (1980 Act made "unacceptable geographic and political distinctions"); H.R.Rep. No. 96-608, 96th Cong., 2d Sess. 13 (1979) U.S.Code Cong. & Admin.News 1980, p. 141 (under Refugee Act "the plight of the refugees themselves, as opposed to national origin or political considerations, should be paramount in determining which refugees are to be admitted to the United States"); Anker & Posner, The Forty-Year Crisis: A Legislative History of the Refugee Act of 1980, 19 San Diego L.Rev. 34-56 (1981) (tracing Congress' concerns with and desire to control executive branch dominance of asylum and refugee policy).
 
 
 74
 The congressional directive to apply the Refugee Act neutrally has not been respected, however. According to recent figures covering the first three quarters of 1987, the approval rate for asylum cases filed with INS district directors is as follows: Nicaragua, 83.9%, Iran 67.4%, Romania, 59.7%, Afghanistan, 26.2%, Guatemala, 3.8%, and El Salvador, 3.6%. The overall approval rate for this period (covering all countries, 7,516 cases) was 54%. See Immigration Law And Defense Sec. 13.1(c), at 13-8 n. 9 (3d ed.1989). A further study reported that in 1984, 66% of the Iranian requests and 49% of the Polish requests for political asylum were granted as opposed to 2% from El Salvador. The study also found that among those aliens that had based their asylum applications on fear of torture, "only applicants from El Salvador had actually been deported." Id. (citing U.S. Gov't Accounting Office, Briefing Report to the Hon. Arlen Specter, U.S. Senate, Asylum: Uniform Applications Of Standards Uncertain 15-17, 34 (1987)). See also Note, A Refugee by Any Other Name: An Examination of the Board of Immigration Appeals' Actions in Asylum Cases, 75 Va.L.Rev. 681, 711-12 & n. 145 (1989) [hereinafter Refugee by Any Other Name ] (noting that although El Salvador produces 24% of yearly asylum aspirants, its citizens received only 4.5% of the asylum grants in 1987).
 
 
 75
 Even assuming that the above discrepancy may be explained partially by the fact that more applicants (and more meritless claims) come from El Salvador and other Latin American countries, these statistics suggest an impermissible infusion of ideology into the asylum process. Cf. Comment, Salvadoran Illegal Aliens: A Struggle To Obtain Refuge in the United States, 47 U.Pitt.L.Rev. 295, 315-18 (1985) (detailing how ideological factors prejudice Salvadoran refugee applicants more than any other nation's applicants). An examination of two Board decisions is illustrative. In Matter of Maldonado-Cruz, Int.Dec. 3041 (BIA Jan. 21, 1988), rev'd and deportation prohibited, 883 F.2d 788 (9 Cir.1989), the El Salvadoran applicant claimed that he would be persecuted by government forces because he had been briefly forced to participate in guerrilla activities. The Board rejected this claim, holding that "the Government of El Salvador ... has the internationally-recognized right to protect itself against the guerrillas who seek to overthrow it.... [And it] therefore, has a legitimate right to investigate and detain individuals suspected of aiding ... [a guerrilla] organization." Int.Dec. 3041 at 13 (citing Handbook p 175). See also Matter of Jose Oscar Diaz-Alfaro, BIA unpublished dec., File No. A26267407 (Aug. 6, 1987) (Board rejects similar claim from El Salvadoran).
 
 
 76
 However, in Matter of Miguel Sopena-Fernandez, BIA unpublished dec., File No. A28279551 (July 15, 1987), a Cuban applicant raised the same argument, stating that he feared persecution because he participated in organizations hostile to the Castro government. Without mentioning the Cuban government's right to "investigate and detain individuals," the Board granted the petition, concluding that "the applicant's account of why he fears persecution based on his membership in the [subversive organization is] plausible, detailed and coherent." Id. at 3. See also Matter of Mohammed Osman Mohibi, BIA unpublished dec., File No. A27497579 (July 27, 1987) (Board accepts argument from Afghani applicant fearing persecution because of his membership in group opposed to Soviet-backed government).[5]
 
 
 77
 Given this inconsistent application of the well-founded fear standard by the Board, which violates the Refugee Act's express mandate to consider asylum requests without regard to country of origin, I would accord the Board's interpretation in this case significantly less deference than I might its other determinations. See Note, Refugee by Any Other Name, supra, at 720 ("Because the Refugee Act was intended to create an ideologically neutral asylum process ..., the Board has a responsibility to eliminate actual and apparent political and foreign policy influences from its decisions whenever possible.").
 
 II. The Prima Facie Case
 
 78
 A prima facie case for refugee status is established when an alien presents "affidavits or other evidentiary material," 8 C.F.R. Sec. 103.5 (1985), which, if true, demonstrate a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Sakhavat v. INS, 796 F.2d 1201, 1203 (9 Cir.1986). M.A.'s petition presents a special problem because the definition of refugee in Sec. 1101(a)(42)(A) is silent regarding whether the refusal to serve in a nation's military can support an application for political asylum. However, an analysis of the Handbook, which has been universally recognized as the authoritative source for understanding the international obligations of the United States toward refugees,[6] identifies "deserters and persons avoiding military service" as a special category of refugees. Handbook pp 167-174; see also Salim, 18 I & N Dec. at 313 (eligibility for asylum may be based on individual aversion to forced military service).
 
 
 79
 The Handbook recognizes that although draft evasion typically should not provide a basis for refugee status, nevertheless such status should be granted (1) where the alien's desertion or failure to serve "is concomitant with other relevant motives" for leaving his country, p 168; or (2) where the alien would suffer "disproportionately severe" punishment on account of his race, religion, nationality, membership in a particular social group or political opinion, p 169. Most importantly, the Handbook provides further that:
 
 
 80
 the necessity to perform military service may be the sole ground for a claim to refugee status, i.e. when a person can show that the performance of military service would have required his participation in military action contrary to his genuine political, religious or moral convictions, or to valid reasons of conscience.
 
 
 81
 Handbook p 170 (emphasis added). With regard to this claim, the Handbook elaborates:
 
 
 82
 Not every conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion.... Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in light of all other requirements of the definition, in itself be regarded as persecution.
 
 
 83
 Id. p 171 (emphasis added).
 
 
 84
 Despite the majority's ostensible adherence to the Handbook, it has engrafted three additional legal requirements for asylum status: it now requires applicants in M.A.'s position to demonstrate (1) a formal, official policy of the government in question that promotes human rights violations; (2) condemnation of the military actions by international governmental bodies; and a showing (3) that the individual will be compelled to engage personally in inhuman conduct as a part of his military service. All of these rules contravene the language of the Handbook and virtually eliminate the recognition of conscientious objection as a basis for political asylum.
 
 A.
 
 85
 The requirement that an asylum applicant show that the government in question adheres to a formal policy of human rights and international law violations has no basis in the Refugee Act of 1980 or the Handbook. The Handbook speaks only of the "type of military action," p 171, and makes no mention of governmental policy with respect to such action. More importantly, the requirement that the Salvadoran government issue an official policy of torture or indiscriminate killing can never be satisfied; no government wishing to remain even remotely connected with the international community would openly advocate such a policy. See Bolanos-Hernandez v. INS, 767 F.2d 1277, 1285 (9 Cir.1985) ("[p]ersecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution"); Ananeh-Firempong v. INS, 766 F.2d 621, 628 (1 Cir.1985) ("unless an alien were allowed to rely upon [outside] sources, it is difficult to see how he or she could make out a case of political or social repression in a distant land").
 
 
 86
 The majority maintains, however, that without such a requirement, "any male alien of draft age from just about any country experiencing civil strife could establish a well-founded fear of persecution." Maj. Op. at 312 (emphasis in original). This overbroad conclusion ignores the other requirements that a draft-age alien must meet before obtaining refugee status. First, the applicant must show that the government in question is unwilling or unable to control the offending group, which here is the armed forces. See Arteaga v. INS, 836 F.2d 1227, 1231 (9 Cir.1988) ("The threat of persecution need not come from the government, but may also come from groups ... which the government is 'unwilling or unable to control' ") (quoting McMullen v. INS, 658 F.2d 1312, 1315 n. 2 (9 Cir.1981)); Lazo-Majano, 813 F.2d at 1434 (persecution found by a single member of the armed forces, which the Duarte government cannot control "despite the staunchest efforts," provided basis for well-founded fear). Second, the applicant must show that the military action he or she wishes to avoid has been condemned by the "international community," see infra, a showing that not many "strife-torn" armed forces can meet. And finally, the alien must produce specific, objective evidence that he or members of his group, which includes those with the same political beliefs of the petitioner, have been, or will be, subjected to persecution. See Part II.C. infra. I think these requirements present enough of a hurdle to demonstrate that the majority's "floodgates" argument is a groundless fear.
 
 B.
 
 87
 Similarly unfounded is the majority's holding that the Board may recognize condemnation of El Salvador's actions only from "recognized international governmental bodies." The drafters of the Handbook, and by implication the Congress that passed the Refugee Act of 1980, did not see it this way.[7] Paragraph 171 of the Handbook provides that refugee status may be granted when the military action with which the individual does not wish to be associated is "condemned by the international community as contrary to basic rules of human conduct ..." (emphasis added). To be sure, the term "international community" may include condemnation from the United Nations or "recognized governmental bodies" like the Organization of American States,[8] but nowhere in the Handbook does it say that these bodies represent the only source of international opinion or that evidence from private agencies is to be excluded.[9] If one ignored such evidence, producing evidence of international condemnation would often be virtually impossible, as "[g]overnments understandably shy away from making such statements about their allies in a public forum." Legomsky, Political Asylum and the Theory of Judicial Review, 73 Minn.L.Rev. 1205, 1209 (1989). Accepting the Board's interpretation, therefore, would make paragraph 171 a nullity, or at least restrict its applicability only to nations such as South Africa, and that is something the Handbook clearly did not intend to do.
 
 
 88
 Instead, the Handbook intended for applicants in M.A.'s position to show that the military action wishing to be avoided "violates international humanitarian law (the laws of war), or that the military forces in which [the alien] is resisting service violat[e] internationally recognized human rights." Letter From Joachim Henkel, Deputy Representative of the United Nations High Commissioner for Refugees, to Karen Musalo, Esq. (Jan. 30, 1986). As we stated in M.A. I, the basic rules of humanitarian conduct are "well documented and readily available to guide the Board in discerning what types of actions are considered unacceptable by the world community." 858 F.2d at 218.[10] Since the founding of the United Nations, nongovernmental organizations such as Amnesty International and Americas Watch have been full and active participants in the development of human rights law, and their writings have long been considered a valid source of international law. Consequently, the notion that these organizations cannot serve as a source for the basic rules of international behavior has been accepted neither by the international community nor by the judiciary in past cases. See Charter of the United Nations and Statute of the International Court of Justice, June 26, 1945, art. 38(1)(d), 59 Stat. 1031, T.I.A.S. No. 993, 145 U.K.F.S. 805; Coriolan v. INS, 559 F.2d 993, 1002-03 (5 Cir.1977) ("the opinion of Amnesty International is conclusive neither upon this Court nor upon the Immigration and Naturalization Service [b]ut the evaluation in this report is certainly relevant" and its materiality is "surely beyond dispute").
 
 
 89
 The majority asserts, however, that consideration of these reports "is problematic almost to the point of being nonjusticiable." Maj. Op. at 313. Reliance on these publications, the majority warns, is tantamount to a judicial statement about American foreign policy. Even if such reliance constituted in some way an indirect condemnation of the government in question,[11] the Congress has explicitly empowered the federal judiciary to review and, if necessary, correct INS determinations of the asylum standard. See Immigration and Nationality Act, 8 U.S.C. Sec. 1105a(a) (1982) (final orders of deportation, and basis for these orders, reviewable by U.S. Courts of Appeals); cf. Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (per curiam). Accordingly, courts have for decades routinely considered evidence of overall political violence and human rights abuses in foreign countries in the adjudication of asylum claims, see Mendez-Efrain v. INS, 813 F.2d 279, 282 (9 Cir.1987); Bolanos-Hernandez, 767 F.2d at 1284, in the adjudication of requests for extradition of foreign nationals, see Quinn v. Robinson, 783 F.2d 776, 788 (9 Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986), and in the adjudication of INS petitions for revocation of citizenship, see United States v. Demjanjuk, 518 F.Supp. 1362, 1363-80 (N.D. Ohio 1981) (lengthy review of atrocities committed by National Socialist Germany as foundation for action to revoke citizenship under 8 U.S.C. Sec. 1451(a)), aff'd, 680 F.2d 32 (6 Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). Since the majority does not challenge the judiciary's authority to adjudicate in these areas, which obviously entail significant review of the policies of the government in question, then it is unclear to me how the mere consideration of reports from private organizations transforms the asylum question into one unfit for judicial review.
 
 
 90
 In my view, our task is straightforward and devoid of judicially-imposed political considerations: we must assess the legitimacy of an alien's fear of persecution using affidavits or other evidentiary material without regard for political ideology or country of origin. See 8 U.S.C. Sec. 1101(a)(42)(A), 8 C.F.R. Sec. 103.5. As one commentator has noted, "the BIA will have no advantage over a court in assessing the legitimacy of [this] fear," Legomsky, supra, at 1213, and our refusal to consider all relevant evidence because of the possibility that we may indirectly criticize a government currently friendly to the United States constitutes an abdication of our directives from the Congress. Or, as Judge Breyer of the First Circuit has put it, "[t]o offer refuge to those faced with genuine threats of persecution but to forbid them to offer journalistic accounts, expert opinions, and third-party reports in their efforts to prove it would simply 'sound the word of promise to the ear but break it to the hope.' " Ananeh-Firempong, 766 F.2d at 628.
 
 C.
 
 91
 My final disagreement with the majority concerns its holding that because the El Salvador military has not threatened M.A. with violence, his plight is the same as any other El Salvador draft-age male. As the majority notes, the well-founded fear inquiry requires an examination of an alien's genuine subjective fear and an objective basis sufficient to render this fear reasonable. With regard to the subjective component, it is undisputed that M.A. fled El Salvador because of fear generated by his personal experiences with the military and his neutral political beliefs.
 
 
 92
 As to the objective component, our previous cases have required an asylum applicant to provide "specific and objective facts" detailing a "good reason" to fear, or "reasonably expect," persecution. Figeroa v. INS, 886 F.2d 76, 80 (4 Cir.1989); Cruz-Lopez v. INS, 802 F.2d 1518, 1522 (4 Cir.1986). "In short," Chief Judge Ervin recently stated, " 'the evidence should be specific enough to indicate that the alien's predicament is appreciably different from the dangers faced by the alien's fellow citizens.' " 886 F.2d at 80 (quoting Vides-Vides v. INS, 783 F.2d 1463, 1469 (9 Cir.1986)).
 
 
 93
 I think M.A.'s evidence details more than a "good" reason to "reasonably expect" persecution.[12] Unlike the applicant in Cruz-Lopez, who had received a widely-distributed threatening note from the guerrillas, or the applicant in Figeroa, who alleged that he feared persecution because he lived in an area suffering from guerilla violence, M.A. has detailed acts of repression against both his family and himself. In his Request For Asylum in the United States, M.A. detailed how a cousin was killed after participating in an antigovernment demonstration, how a relative of his wife, whom M.A. had spoken with about possibly joining the guerrillas, was later killed by the government, and how another relative was killed after having fed antigovernment guerrillas in his home.
 
 
 94
 Additionally, M.A. has described acts of individualized repression: he has been beaten twice by National Guardsmen at roadblocks, once for being suspected of covert political activity, and once for no apparent reason. At one point, a friend recruited M.A. to serve as a spy for the army but, after attending several meetings with military representatives, he ceased participating, despite the knowledge that others who were uncooperative had been killed by the government. In one affidavit, M.A. presented the statement from a prominent American observer that "[t]o be a man of military age and not to have served in the Armed Forces, in addition to having fled the country, is enough to create the suspicion that that individual is an opponent of the government. And to be suspected of being an opponent of the government in El Salvador, is to be in grave danger." To support this conclusion, M.A. presented not only the reports by Amnesty International and Americas Watch, which describe the general conditions in El Salvador, but several affidavits that describe how young males are conscripted into the military and forced to perform atrocities.[13]
 
 
 95
 In my view, an alien has set himself apart from his fellow countrymen and satisfied our prior, commonsense interpretation of the well-founded fear standard when he has sustained family deaths at the hand of the government, has been beaten up because of suspected political activity, and has refused to serve as a spy for the military. The majority, however, concludes that this evidence is insufficient because M.A. has not shown that the military has threatened him personally or would force him to commit these atrocities if he returned to his country. Requiring an alien to produce a personalized threat from the military imposes an almost impossible burden on the applicant. As we recognized recently in Figeroa,
 
 
 96
 refugees sometimes are in no position to gather documentary evidence establishing specific or individual persecution or a threat of such persecution. Accordingly, if documentary evidence is not available, the applicant's testimony will suffice if it is credible, persuasive, and refers to 'specific facts that give rise to an inference that the applicant has been or has a good reason to fear that he or she will be singled out for persecution....'
 
 
 97
 886 F.2d at 80 (quoting Cardoza-Fonseca v. INS, 767 F.2d 1448, 1453 (9 Cir.1985), aff'd, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)) (quoting Carvajal-Munoz v. INS, 743 F.2d 562, 574 (7 Cir.1984)) (emphasis in original).
 
 
 98
 In addition to minimizing M.A.'s personalized experiences, the majority has ignored the evidence of familial persecution submitted by petitioner. In Cruz-Lopez, we indicated that "familial persecution" was relevant in demonstrating a well-founded fear. 802 F.2d at 1522; see also Figeroa, 886 F.2d at 80. This recognition is in line with the numerous courts which have held that evidence of violence directed against an alien's family lends "considerable strength" to an asylum claim. See, e.g., Ananeh-Firempong, 766 F.2d at 627 ("[E]vidence about treatment of one's family [is] probative of [a specific threat to the petitioner]."); see also Handbook p 43, at 13 (threat of persecution "need not be based on the applicant's own personal experience"; evidence concerning relatives may show that alien's fear is well-founded). One court has even stated that "[t]he fact that there has been a number of threats or acts of violence against members of an alien's family is sufficient to support the conclusion that the alien's life or freedom is endangered." Hernandez-Ortiz, 777 F.2d at 515.
 
 
 99
 Finally, the majority seems to penalize M.A. for the fact that his fears are grounded in the "generally violent" conditions in El Salvador. Documentary evidence of pervasive national violence, however, should not be used to undermine the significance of the specific threats to M.A.'s freedom, but instead "presents an 'additional reason to take the threat seriously.' " Hernandez-Ortiz, 777 F.2d at 515 (quoting Bolanos-Hernandez, 767 F.2d at 1285). Several courts have recognized that "conditions in the [alien's] country of origin" and the "experience of others" in that country is "relevant," although not dispositive, to the well-founded fear inquiry. See, e.g., Castenada-Hernandez v. INS, 826 F.2d 1526, 1531 (6 Cir.1987). One panel of the Ninth Circuit found the conditions in El Salvador so disturbing that it took judicial notice of the reported violence, concluding that the reports which describe the violence "are sufficiently credible to show that [the alien] ... would be in serious jeopardy if forced to return to her native land." Lazo-Majano, 813 F.2d at 1435. A federal district court, after making numerous findings of fact concerning the "wide cross-section of Salvadoran society [that] suffer[s] human rights abuses," recently concluded that a "substantial number of Salvadorans who flee El Salvador possess a well-founded fear of persecution...." Orantes-Hernandez v. Meese, 685 F.Supp. 1488, 1491 (C.D.Cal.1988).
 
 
 100
 By minimizing the evidence of familial persecution and the general conditions in El Salvador, the majority has strayed from the central nature of the well-founded fear inquiry, which focuses on the probability of the alien's objective fears, not on the certainty of these fears, or on whether the military has the alien's name on a "hitlist." See Cruz-Lopez, 802 F.2d at 1524 (Winter, C.J., dissenting) ("Certainty is not possible, but certainty is not required.").[14] Taking M.A.'s personal evidence, along with his affidavits regarding forced conscription and governmental retribution for refusal to perform military service, it does not take much imagination to conclude that M.A. has a "good reason" to fear persecution if returned to his native land. The evidence also demonstrates that such persecution will be imposed on M.A. because of his political opinions. Although M.A. has not "engaged in a lot of political activity," choosing to remain neutral is " 'no less a political decision than is choosing to affiliate with a particular political faction.' " Maldonado-Cruz, 883 F.2d at 791 (quoting Bolanos-Hernandez, 767 F.2d at 1286).[15] Moreover, when deciding whether an alien faces persecution on account of political opinion, "one must continue to look at the person from the perspective of the persecutor. If the persecutor thinks the person guilty of a political opinion, then the person is at risk." Lazo-Majano, 813 F.2d at 1435; see also Maldonado-Cruz, 883 F.2d at 792 (alien fears persecution on account of political opinion because El Salvador government views him as associated with guerrillas). Here, M.A. presented evidence showing that the government already had beaten him for suspected covert activity, and that those who refuse to perform military service face almost certain retribution. Thus, if M.A. returns to El Salvador, refuses to serve in the military, and sustains retribution from the government, it will result not from his status as a draft-resister, but rather from his status as a political neutral (or at least as someone hostile to the intentions of the Salvadoran military). Cf. Desir v. Ilchert, 840 F.2d 723, 728 (9 Cir.1988) (alien persecuted because of political opinion imputed by persecutor); Hernandez-Ortiz, 777 F.2d at 517 (alien's actual political view, whether neutral or partisan, irrelevant; where government attributed certain political opinions to him this constituted persecution on account of political opinion).
 
 III.
 
 101
 Because M.A. has presented specific evidence of past violence to him and his family, in conjunction with general corroboration of the violent conditions in El Salvador and the reprisals acted out on those who refuse to perform military service, I would conclude that "persecution is a reasonable possibility." Stevic, 467 U.S. at 424-25, 104 S.Ct. at 2498. Consequently, I would reverse the judgment of the Board and remand this case with instructions to afford M.A. an opportunity to prove his case.
 
 
 102
 ERVIN, Chief Judge, and PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges, authorize me to say they concur in this opinion.
 
 
 
 [1]
 Pursuant to Congressional authorization in 8 U.S.C. Sec. 1103, the Attorney General has delegated his authority and discretion to reopen deportation proceedings to the Commissioner of the INS, 8 C.F.R. Sec. 2.1, and to immigration judges, 8 C.F.R. Sec. 242.8(a), whose decisions are reviewable by the BIA, 8 C.F.R. Sec. 242.21
 
 
 [2]
 Title 8 U.S.C. Sec. 1158(a) provides:
 The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.
 
 
 [3]
 Title 8 U.S.C. Sec. 1101(a)(42)(A) defines the term "refugee" to mean:
 any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 [4]
 Although Cruz-Lopez was decided prior to the Supreme Court decision in Cardoza-Fonseca, it analyzed the requirement of "objective reasonableness" inherent in the term "well-founded fear" on the basis of the "generous" standard of proof later accepted in Cardoza-Fonseca. See 802 F.2d at 1521-22 & n. 5
 
 
 [5]
 The Handbook provides "significant guidance" in construing the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1967), compliance with which was a "primary purpose[ ]" of the Refugee Act of 1980. Cardoza-Fonseca, 480 U.S. at 436, 107 S.Ct. at 1216. Although the Handbook is not legally binding, the Board and the courts frequently rely on it when interpreting the Refugee Act. Id. at 438-39 & n. 22, 107 S.Ct. at 1217 & n. 22
 
 
 [6]
 The dissent's charge that the majority considers the reports of private organizations to be "biased, standardless, and of little probative value," infra page 323 n. 9, is wholly misplaced. We respect the role of these organizations in documenting human rights abuses, but we are not about to use these reports as the basis for overturning the judgment of the Board or for issuing judicial condemnations of the conduct of foreign governments, especially where the Board itself found no evidence of international governmental condemnation in this case. As to "standardlessness," we have never said that the reports themselves are standardless, but rather that the use of these reports to overturn the Board here would leave judges in a world that is barren of guidance for the legal judgments they purport to reach. As to the probativeness of this evidence, we do not say that the Board should not consider it, only that its method of evidentiary assessment did not constitute the abuse of discretion that would justify our overturning its judgment. The dissent persists in ignoring the fact that this case comes to us in a reopening posture. More fundamentally, in issuing its invitation to correct what it perceives as "the politicization of the asylum process," infra page 319, the dissent ignores the difference between political declarations proffered by the judicial branch and those of the Congress and the Executive
 
 
 [1]
 See, e.g., Matter of Reyes, 18 I & N Dec. 249, 252 (BIA 1982) (declining to grant reopening because, even assuming prima facie eligibility, relief would be denied in the exercise of discretion)
 
 
 [2]
 The Cardoza-Fonseca Court also noted that courts "must respect the interpretation of the agency" when the issue is one of application of the appropriate legal standard "to a particular set of facts." Cardoza-Fonseca, 480 U.S. at 448, 107 S.Ct. at 1221. This case, however, turns not on the application of the well-founded fear standard to a particular set of facts, but rather on the proper scope of the standard itself. Cf. Union of Concerned Scientists v. NRC, 824 F.2d 108, 113 (D.C.Cir.1987) (deference not owed because Cardoza-Fonseca limits application of Chevron test "to circumstances in which an agency is required to apply a legal standard to a particular set of facts"). One commentator has noted that "the [Cardoza-Fonseca ] Court's analysis appears designed to guide the INS down a particular interpretive path in future applications of the well-founded-fear standard; the Court's detailed refutations of the INS's arguments ... leave a narrow range for future reasonable INS articulations of the well-founded-fear standard. The decision is thus reminiscent of a pre-Chevron line of precedent in which the Court indicated that administrative interpretations of statutes play, at most, an advisory role for the courts in setting forth legal standards." The Supreme Court, 1986 Term--Leading Cases, 101 Harv.L.Rev. 119, 349 (1987)
 
 
 [3]
 The majority's attempt to bolster its reasoning with Abudu does not persuade me otherwise. Although the Abudu Court explicitly distinguished the prima facie case from the "quite separate" discretionary decisions to deny motions to reopen, see 485 U.S. at 108, 108 S.Ct. at 913, the majority today states that Abudu recognizes a discretionary component in the prima facie case on reopening. I do not read Abudu in this manner. The only comment made by the Abudu Court regarding prima facie eligibility was that the "untimeliness of an asylum claim may be relevant" to the prima facie case on reopening. Id. at 109 n. 14, 108 S.Ct. at 914 n. 14. To me, this comment does not add new elements to the prima facie burden on reopening, but rather constitutes a recognition that the Board may consider untimeliness when passing upon the credibility of a petitioner's evidence, which is something the Board already may do in an initial application for asylum. Moreover, the untimeliness issue is irrelevant in this case, for the Board did not pass upon the credibility of M.A.'s evidence, and this court already has determined that any untimeliness is excused
 
 
 [4]
 United Nations Protocol Relating to the Status of Refugees, opened for signature Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267
 
 
 [5]
 Consider also the case of Matter of Salim, 18 I & N Dec. 311 (BIA 1982), a case quite similar to M.A.'s, as it concerned an Afghani who resisted military induction by the Soviet Union. In granting the petitioner refugee status, the Board held that "illegal dragooning" was a proper basis upon which to grant asylum. In this case, however, the Board argued that such "dragooning" was acceptable if performed by a domestic, as opposed to a foreign (Soviet), government. See M.A. I, 858 F.2d at 219 (rejecting distinction)
 
 
 [6]
 See, e.g., U.S. Refugee Program: Oversight Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 24, 26 (1981) (Memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, to David Crossland, General Counsel, INS) ("We assume that Congress was aware of the criteria articulated in the Handbook when it passed the Act in 1980, and that it is appropriate to consider the guidelines in the Handbook as an aid to construction of the Act.")
 
 
 [7]
 Evidently, the Board did not see it this way either in the Salim case, for it declined to impose the requirement of governmental condemnation there
 
 
 [8]
 It is of course important to note that the United Nations has "expressed deep concern at the situation of human rights in El Salvador." In 1985, the United Nations stated that "a situation of generalized warlike violence continues to exist ... and that the number of political prisoners and abductions has increased." United Nations General Assembly Resolution No. 401139 (Dec. 13, 1985)
 
 
 [9]
 Despite the majority's disavowal, maj. op. at n. 6, its ruling has rendered private agency reports of violence virtually irrelevant in the vast number of asylum cases. First, by sanctioning the Board's refusal to consider these reports, the majority has signaled the Board that only evidence of governmental condemnation need be considered. Second, and more importantly, the majority has precluded reviewing courts from considering these reports as evidence of persecution in the absence of state-sponsored condemnation. And finally, by indicating that these reports are biased, standardless, and have little probative value, the majority has informed the Board that it should not consider them either. In sum, we think that the Board can only understand that the message to it that these reports are irrelevant is loud and clear
 
 
 [10]
 Of course, the sources of these rules comprise only guides for the Board in discerning whether a draft resister may qualify as a refugee. "[T]he INS remains free to dispute the veracity of this information, the significance of the specific facts it indicates, and the authority of the sources. The INS can introduce conflicting evidence casting doubt upon the petitioner's allegations." Ananeh-Firempong, 766 F.2d at 628
 
 
 [11]
 This is questionable, however. By allowing an asylum applicant to submit evidence of condemnation from private international organizations, a court does not indicate its approval of such opinions, but merely recognizes that a "reasonable person" could fear persecution if the published reports were true. Indeed, even a finding that the alien has a well-founded fear suggests only that one individual fears persecution, and not that the government in question is an international outlaw
 
 
 [12]
 Even if this court cannot consider M.A.'s evidence in the light most favorable to him after Abudu, the materials submitted by the alien must still be taken as true if not "inherently unbelievable" or contradicted by the INS. Here, the Board never questioned the veracity or accuracy of the petitioner's evidence. Thus, "[i]t must be assumed that [it] found [the alien's] testimony credible." Lazo-Majano, 813 F.2d at 1434
 
 
 [13]
 These affidavits can only be bolstered by the recent disclosures of the El Salvadoran President. See Tracking the Jesuits' Killers, Washington Post, Jan. 9, 1990, at A18, col. 1 (praising President Christiani for admitting that top military officials ordered a 45-man unit to assassinate six priests, their housekeeper and the housekeeper's daughter)
 
 
 [14]
 The Cardoza-Fonseca Court certainly spoke in terms of probabilities, as it indicated that if a male alien could show that one in ten males in his country were put to death or forced to serve in a labor camp, "it would be only too apparent that anyone who has managed to escape from the country in question will have" a well-founded fear of persecution "upon his eventual return." Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. at 1213 (quoting 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966))
 Indeed, the standard the majority imposes today resembles the standard utilized in determining whether the Attorney General must withhold deportation under 8 U.S.C. Sec. 1253(h). In INS v. Stevic, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), the Court held that to qualify for this entitlement to withholding of deportation, an alien must demonstrate that "it is more likely than not that the alien would be subject to persecution" in the country to which he would be returned. 467 U.S. at 429-30, 104 S.Ct. at 2501.
 
 
 [15]
 The majority's conclusion that M.A. has not affirmatively made a decision to remain neutral is belied by the fact that M.A. explicitly rejected efforts to recruit him as a government oreja ("ear"), and by the fact that M.A. fled El Salvador rather than serve in the government military or the guerrillas